*162
 
 ELMORE, Judge.
 

 *424
 
 Respondent-mother appeals from the trial court's orders adjudicating her son, K.B. (Kirk)
 
 [1]
 
 , an abused, neglected, and dependent juvenile. For the following reasons, we affirm.
 

 I. Background
 

 Respondent-mother and respondent-father adopted Kirk when he was five years old. When Kirk was two years old, he tested positive for cocaine and was removed from his biological mother's home. Kirk was placed in a foster home where he resided for three years. His biological mother relinquished her parental rights and his biological father's parental rights were terminated by the court. Although Kirk's foster mother wished to adopt him, his foster father did not. Kirk was quickly placed for adoption with respondents in July 2011 and the adoption was finalized in December 2011.
 

 Shortly after adopting Kirk, respondent-mother became pregnant with twins, a boy and a girl. Kirk began to act out and exhibit behavioral issues. Respondent-mother attributed Kirk's change in behavior to his past experience of being displaced by a new baby boy in his foster home.
 

 From 21 February 2012 to 9 November 2015, the Durham County Department of Social Services (DSS) received fifteen Child Protective Services (CPS) reports regarding Kirk. DSS substantiated three reports filed 7 May 2012, 11 September 2013, and 26 September 2013 for neglect due to improper discipline. Respondent-mother admitted to hitting Kirk with a ruler in 2012, and Kirk was found to have thirty to fifty belt marks on his buttocks, right thigh, and hip in September 2013. Respondent-father
 
 *425
 
 admitted that he and respondent-mother spanked Kirk as a form of discipline. After the September 2013 reports, DSS began in-home services with the family. They completed the services and the case was closed in July 2014.
 

 Because respondents continued to have issues with Kirk's behavior, he was placed in a kinship placement from 26 September to 7 October 2013, a therapeutic foster home from 23 October 2013 to 31 March 2014, and the Wright School from 2 February to 10 September 2015.
 

 After Kirk returned home from the Wright School, DSS received a CPS report on 9 November 2015 alleging that Kirk had " 'black and bruising' around the left eye, ... bruising around the lips, scratches on the bridge of the nose, and below the lips, [Kirk's] right pointer finger [was] swollen from the knuckle to the tip and the side of the fingers on the right hand [were] punctured." The report also alleged that respondents did not seek a psychiatrist for Kirk as recommended upon his release from the Wright School and allowed Kirk's prescription for Prozac to lapse from 30 October to 10 November 2015, at a minimum.
 

 DSS filed a petition on 13 November 2015 alleging that Kirk was an abused juvenile in that respondents "inflicted or allowed to be inflicted on the juvenile a serious physical injury by other than accidental means." Specifically, the petition alleged that on or about 8 November 2015, Kirk "sustained a black eye, and broken right index finger. The injuries are unexplained. Neither parent or grandmother could provide an explanation for the injuries. After a visit to his psychiatrist, it was stated that his injuries are not self-inflicted." DSS also alleged that Kirk was a neglected juvenile in that he "does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker." Specifically, the petition alleged that on or about 9 November 2015, respondent-father and the grandmother "were home at the time [Kirk] sustained the injuries but neither could provide an explanation as to what happened to the child." As a result, DSS was granted nonsecure custody of Kirk.
 

 The trial court held an adjudication hearing on 13 to 14 April 2016, and on 9 to 10 May 2016. Dr. Beth Herold was accepted as an expert in the field of child physical abuse, child neglect, and child maltreatment. Dr. Herold treated Kirk in November 2015 after receiving a referral from DSS. When she saw Kirk, he "had a broken finger," "bruises on his face, he had a busted lip, and he had an
 
 *163
 
 injury to his chest, some sort of a contusion. He had a purple and yellow bruise and some linear marks through it." Kirk offered multiple explanations for his injuries, claiming
 
 *426
 
 "that he got hit with a rake, that he was wrestling with his father, that he was doing cartwheels, that he dropped a weight on his finger, and that he did it himself." Dr. Herold testified that Kirk's injuries were not consistent with his explanations or with typical self-injury behavior. She opined that it was "highly probable" Kirk was physically abused.
 

 The DSS social worker, Pamela Stanton, testified that at the time of the CPS report respondent-mother told her that Kirk had been off Prozac for at least a week and that "she was sure that some of his behaviors that he was experiencing or displaying in school [were] due to that." Stanton also testified that Kirk gave multiple histories for his injuries, including that he had punched himself in the face, but none explained the severity of injuries he sustained. She testified further that DSS did not receive any reports regarding injuries to Kirk while he was in his other placements outside respondents' home, and that there were instances where mental health treatment was recommended for Kirk but never accessed by respondents. Finally, Stanton testified that respondent-mother previously requested Kirk be removed from her home in 2012 and April 2014, when she told DSS: "I need someone to come get this boy, because if I lay my hands on him, it won't be good."
 

 Respondent-mother testified that she only asked Kirk to be removed from her home when it became "a safety concern," and that she had not spanked Kirk since 2013. She claimed that she was not home when Kirk sustained the injuries in November 2015 and did not know how Kirk was injured: "I was at work during the time that he allegedly snuck out of the home. By the time I got home, he visually had marks on him."
 

 After the hearing, the trial court entered an order on 25 May 2016 adjudicating Kirk an abused, neglected, and dependent juvenile. Respondent-mother entered written notice of appeal.
 
 [2]
 

 II. Discussion
 

 A. Adjudication of Dependency
 

 Respondent-mother first argues the trial court erred in adjudicating Kirk a dependent juvenile because the petition only alleged that Kirk was abused and neglected. We disagree.
 

 "The pleading in an abuse, neglect, or dependency action is the petition." N.C. Gen. Stat. § 7B-401 (2015). In an adjudicatory hearing on a juvenile abuse, neglect, or dependency petition, a trial court is required
 
 *427
 
 to "adjudicate the existence or nonexistence of any of the
 
 conditions alleged in a petition
 
 ." N.C. Gen. Stat. § 7B-802 (2015) (emphasis added). "If the court finds ... that
 
 the allegations in the petition
 
 have been proven by clear and convincing evidence, the court shall so state" in a written order. N.C. Gen. Stat. § 7B-807(a) (2015) (emphasis added).
 

 "[A]llegations in a petition may include specific factual allegations attached to a form petition for support."
 
 In re D.C.
 
 ,
 
 183 N.C.App. 344
 
 , 349,
 
 644 S.E.2d 640
 
 , 643 (2007) (citation omitted) (internal quotation marks omitted). Moreover, "[w]hile it is certainly the better practice for the petitioner to 'check' the appropriate box on the petition for each ground for adjudication, if the specific factual allegations of the petition are sufficient to put the respondent on notice as to each alleged ground for adjudication, the petition will be adequate."
 
 Id.
 
 at 350,
 
 644 S.E.2d at 643
 
 .
 

 A "dependent juvenile" is defined as
 

 [a] juvenile in need of assistance or placement because (i) the juvenile has no parent, guardian, or custodian responsible for the juvenile's care or supervision or (ii) the juvenile's parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement.
 

 N.C. Gen. Stat. § 7B-101(9) (2015).
 

 Here, DSS did not "check the box" alleging dependency on the form petition filed on 13 November 2015. The allegations attached to the petition, however, were sufficient to
 
 *164
 
 put respondent-mother on notice that dependency would be at issue during the adjudication hearing. The attached specific statement of facts alleged:
 

 The child [Kirk] (9 years old) has "black and bruising" around the left eye, bruising around the lips, scratches on the bridge of the nose, and below the lips, the child's right pointer finger is swollen from the knuckle to the tip and the side of the fingers on the right hand are punctured all [sic] the injuries listed above were unexplained by the legal custodians.
 

 The legal custodian was unable to provide an alternative placement resource for the child
 
 . The child is diagnosed with ODD, PTSD, Adjustment DX, reactive attachment DX and suicidal thoughts. The child was prescribed the
 
 *428
 
 following medications Prozac 10mg and adderal [sic] 40 mg.
 

 The legal custodian reported the child left the home several times over the weekend and the injuries were sustained.
 
 The legal custodian failed to provide proper supervision
 
 .
 

 (Emphasis added.) These allegations encompass the language reflected in the statutory definition of dependency-specifically, that respondent-mother failed "to provide for [Kirk's] care or supervision and lacks an appropriate alternative child care arrangement." N.C. Gen. Stat. § 7B-101(9). Moreover, the first sentence of the trial court's order entering stipulations for adjudication provides: "This matter coming on to be heard before the undersigned judge [ ], on the Durham County Department of Social Services (DSS)
 
 petition alleging abuse, neglect and dependency
 
 ." (Emphasis added.) The record shows that respondent-mother had adequate notice that dependency would be at issue during the adjudication phase of the proceedings.
 

 B. Adjudication of Abuse
 

 Respondent-mother next argues the trial court erred in adjudicating Kirk an abused juvenile because the court's findings of fact do not support its conclusions that Kirk was abused.
 

 We review a trial court's adjudication order "to determine '(1) whether the findings of fact are supported by clear and convincing evidence, and (2) whether the legal conclusions are supported by the findings of fact.' "
 
 In re T.H.T.
 
 ,
 
 185 N.C.App. 337
 
 , 343,
 
 648 S.E.2d 519
 
 , 523 (2007) (quoting
 
 In re Gleisner
 
 ,
 
 141 N.C.App. 475
 
 , 480,
 
 539 S.E.2d 362
 
 , 365 (2000) ),
 
 aff'd as modified
 
 ,
 
 362 N.C. 446
 
 ,
 
 665 S.E.2d 54
 
 (2008). "If such evidence exists, the findings of the trial court are binding on appeal, even if the evidence would support a finding to the contrary."
 
 Id
 
 . (citation omitted). Unchallenged findings of fact are deemed supported by sufficient evidence and are binding on appeal.
 
 Koufman v. Koufman
 
 ,
 
 330 N.C. 93
 
 , 97,
 
 408 S.E.2d 729
 
 , 731 (1991). "The trial court's 'conclusions of law are reviewable
 
 de novo
 
 on appeal.' "
 
 In re D.H.,
 

 177 N.C.App. 700
 
 , 703,
 
 629 S.E.2d 920
 
 , 922 (2006) (quoting
 
 Starco, Inc. v. AMG Bonding & Ins. Servs.
 
 ,
 
 124 N.C.App. 332
 
 , 336,
 
 477 S.E.2d 211
 
 , 215 (1996) ).
 

 Respondent-mother contends that the evidence of abuse did not meet the clear and convincing standard. She argues that the trial court's findings of fact and conclusion of law stating that respondents' failure to properly supervise Kirk and maintain his medication led to a risk of injury would support neglect, not abuse.
 

 *429
 
 An "abused juvenile" is defined in relevant part as
 

 [a]ny juvenile less than 18 years of age whose parent, guardian, custodian, or caretaker:
 

 a. Inflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means;
 

 b. Creates or allows to be created a substantial risk of serious physical injury to the juvenile by other than accidental means....
 

 N.C. Gen. Stat. § 7B-101(1) (2015).
 

 The trial court concluded that Kirk was abused in that respondents "create[d] or allow[ed] to be created a substantial risk of serious physical injury to the juvenile by other than accidental means," and that respondents "inflict[ed] or allow[ed] to be inflicted on the juvenile serious physical injury by other than accidental means." In support
 
 *165
 
 of its conclusions, the trial court made the following findings of fact relevant to abuse:
 

 14. From February 21, 2012 to November 9, 2015, Durham DSS received a total of fifteen (15) reports of abuse or neglect regarding the child....
 

 ....
 

 13. [sic] Since being placed in [respondent-mother's] home, [Kirk] has been placed in a kinship placement from September 26, 2013 to October 7, 2013; a therapeutic foster home from October 23, 2013 to March 31, 2014; and the Wright School from February 2, 2015 to September 10, 2015. The child experienced no substantial injuries in any of the placements outside of the parents' home.
 

 ....
 

 16. At various times, [Kirk]'s medication regimen has been: Adderall since 2010 for ADHD, ceased when placed with [respondents]; restarted Adderall XR 40mg daily in 2012, and from 2/2015-5/2015 he was in residential care at the Wright School where Fluoxetine 10mg daily was added. While at Wright School, [Kirk] was taken off of Depakote and was given Celexa. When discharged from Wright School, [Kirk] was being weaned off of Celexa and Prozac because of stomach pain. [Kirk] was on Adderall
 
 *430
 
 and Prozac at home until the parents let prescription for Prozac lapse on October 29, 2015.
 

 17. The child has had various diagnoses over time, including but not limited to Reactive Attachment Disorder (RAD), PTSD, ADHD, ODD, Adjustment Disorder, and Disruptive Behavior.
 

 18. Durham DSS received a report of abuse on November 9, 2015, stating that: The child has "black and bruising" around the left eye, the child has bruising around the lips, scratches on the bridge of the nose, and below the lips, the child's right pointer finger is swollen from the knuckle to the tip and the side of the fingers on the right hand are punctured. The reporter says that the child is prescribed Adderall and was prescribed Prozac while in the Wright School. The reporter says that upon the child's discharge from the Wright School the parents did not seek a psychiatrist to manage the child's prescriptions and the child has been out of the medications for approximately two weeks. The reporter says that the mother says that the father will have the prescriptions filled. The reporter says that when the child is not taking the Prozac he is irritable and cries. He was without the Prozac from October 30, 2015, until November 10, 2015, at a minimum.
 

 19. At the direction of Durham DSS, the parents took the child to the Duke ER the night of November 9, 2015, because of the injury to the finger. The orthopedic consult found "a moderately displaced fracture of the middle phalanx of the index finger. Minimal clinical deformity and neurovascularly intact. The doctors were unable to determine injury mechanism or age of fracture from x-rays or exam. Being worked up for NAT [non-accidental trauma] due to conflicting stories and bruised chest and eyes." The child received an ED psychiatric evaluation at that time.
 

 ....
 

 25. The CME and Dr. Knutson concluded that the child's injuries were not self-inflicted.
 

 26. The discharge recommendations from the Wright School were not followed by the parents.
 

 *431
 
 27. On November 13, 2015, the child had two black eyes, a fractured finger, bruising around his lips, scratches across his nose and a puncture wound on [his] finger. Various conflicting explanations were given for these injuries.
 

 28. It is the recommended and customary practice of CPS investigators to seek out and review prior CPS reports and the investigative records for same. Social Worker Pam Stanton did so in [Kirk's] case, reviewing records of the CPS reports described in paragraph 12 above, and examining photographs of prior injuries found within those records. The patterns of conduct evident in the prior reports were duly considered in DSS's decision to substantiate physical abuse in its most recent investigation. The social worker and her superiors also relied on statements from mother and information gathered since
 
 *166
 
 November 15, 2015, the records of the Wright School, and the 2013 and 2015 CANMEC reports, in its substantiation.
 

 29. This Court does not need to determine what is or is not in the parents' hearts or whether or not they love the child. The Court would like to believe they do and have become frustrated in their efforts. However, they are not capable of parenting this child in an appropriate manner. There are too many reports, whether the reports are looked at in isolation or looking at the totality of this child's experience. Because of his emotional difficulties, he is a difficult child to parent, and it appears he did not meet their expectations; and they are unable to meet his needs for appropriate discipline, or emotional and medical nurturing. Perhaps, he needs them to be hypervigilant, and they should be, because of what appears to be a pattern of injuries any conscientious parent would take into account and have more supervision. Given their work schedules and the creation of their own family perhaps they do not have the time or capacity to do what is needed for [Kirk]. The extent of his injuries and the lack of reasonable explanation for them creates a condition which is likely to lead to serious physical injury. While the medical professional is saying more likely than not, the Court believes that the totality of the circumstances is clear and convincing.
 

 30. To make sure that he does not hurt himself, accidentally or deliberately, the parents have a duty to take proper
 
 *432
 
 precautions. The Court received and credits the testimony of Dr. Herold that children with emotional difficulties who cut and jab themselves do so because the body provides a release of dopamine which has a calming effect. The injuries noted in [Kirk] are not of the kind typically self-inflicted by children seeking this dopamine release. Dr. Herold explained injuries are also possible from regular childhood activities and when children misjudge their capabilities and that this is not self-harm for the purposes of our evaluation.
 

 31. Various agencies and professionals have attempted to support [respondents] with parenting tools, and sometimes our ways of learning are difficult to change. The belt loop marks from the past are inappropriate.
 

 32. [Respondent-mother] testified that she no longer physically disciplines [Kirk] for fear of getting in trouble. When asked if she resented the frequent CPS reports concerning her family, she stated that they had resulted in a situation in which she had in her home "a child I can't discipline[.]" Physical punishment has diminishing returns. You cannot beat incorrect behavior out of a child. It is unfortunate that she does not recognize this.
 

 33. The parents are incapable of learning correct discipline and care at this time. Unless they acknowledge their role in causing this child physical and emotional harm, accept him and his special needs, and commit to the hard work necessary to safely meet those needs, they will likely continue to be unable to parent this child.
 

 Respondent-mother challenges Findings of Fact Nos. 25, 27, and 29 as not supported by the evidence. We address each in turn.
 

 Respondent-mother first challenges Finding of Fact No. 25, in which the court found that the child medical exam (CME) and psychiatrist, Dr. Katherine Hobbs Knutson, concluded that Kirk's injuries were not self-inflicted, as not supported by the evidence. Indeed, neither the CANMEC report nor Dr. Knutson specifically concluded that the injuries presented by Kirk were not self-inflicted. Rather, the CANMEC report and Dr. Knutson expressed concern that Kirk was physically abused because his injuries were not consistent with the typical self-injury behavior of cutting, burning, pinching or hitting, and that it would be rare to cause the extent of physical injury presented by Kirk by hitting himself. The
 
 *433
 
 report and Dr. Knutson then concluded that it was "highly probable" that Kirk was physically abused. During the hearing, Dr. Herold testified that "[p]robable is one step below clear and one step above suspicious," and that she could not "say with 100 percent certainty" that Kirk was physically abused. Because the CANMEC report and Dr. Knutson did not definitively conclude that the injuries were
 
 *167
 
 not self-inflicted, but only that they were not consistent with typical self-injurious behavior, we hold Finding of Fact No. 25 is not supported by the evidence.
 

 Respondent-mother challenges the portions of Findings of Fact Nos. 27 and 29 in which the court found that conflicting explanations were given for Kirk's injuries. Respondent-mother argues this finding is not supported by the evidence because once Kirk stated that he hit himself in the eye and caused the bruises, he never wavered from this explanation. Respondent-mother contends that the alleged inconsistencies in the CANMEC report were exaggerated and inaccurate. However, Dr. Herold testified at the hearing that Kirk gave multiple histories for the injuries, including that he was hit by a rake, that he was wrestling with his father, that he was doing cartwheels, that he dropped a weight on his finger, and that he did it to himself.
 

 Stanton also testified at the hearing that Kirk offered multiple explanations for the injury to his finger, including someone stepping on it and playing with a weight, and that Kirk initially said he did not know what happened to his eye, then said he was hit with a rake, and finally stated that he hit himself in the face. In the Center for Child and Family Health report, admitted into evidence at the hearing, the clinician noted that during her interview with respondent-mother in December 2015, respondent-mother "asserted that [Kirk] gave several stories [for his injuries] including a rake hurting him, a friend hurt him, and that he had done it himself because he was worried about being in trouble when asked about how he had hurt his eye."
 

 Further, the CANMEC report indicates that respondent-mother told the clinician that "[w]hen the DSS worker came, [Kirk] kept changing his story." Dr. Herold also concluded in the CANMEC report:
 

 The histories surrounding [Kirk's] injuries have been inconsistent. The histories have ranged from dropping a weight on his finger, to doing cart wheels, to someone stepping on his finger. With regards to the bruises on his eyes, histories have included being hit by a friend [ ], hitting himself, and getting hit with a rake. When asked about the large bruise on his chest, [Kirk] reported not knowing
 
 *434
 
 it was there and not knowing how he sustained it. He then reported that he hit himself in the chest as well as him wrestling with his father.
 

 This is competent evidence to support the trial court's findings that Kirk gave inconsistent explanations for his injuries.
 

 Respondent-mother also challenges the portion of Finding of Fact No. 29, in which the court found: "The extent of his injuries and the lack of reasonable explanation for them creates a condition which is likely to lead to serious physical injury. While the medical professional is saying more likely than not, the Court believes that the totality of the circumstances is clear and convincing." Respondent-mother argues that this finding is not supported by the evidence because the evidence supports only a conclusion that it was less than clear that Kirk had been abused. Respondent-mother also challenges Conclusion of Law No. 2, in which the court concluded that the experts were "being cautious" in their assessments that it was only "highly probable" Kirk was physically abused.
 

 The experts based their conclusions that Kirk was physically abused on the extent of the unexplained injuries and their belief that Kirk could not have caused such injuries to himself. However, the trial court appears to base its conclusion that Kirk was abused, in part, on respondents allowing Kirk to cause the injuries to himself. The trial court's findings support this conclusion.
 

 Respondent-mother stipulated, and the trial court found, that she allowed Kirk's Prozac prescription to lapse for a period of time, and respondent-mother admitted to the examining doctors that she believed Kirk's lack of medication caused his behavior problems. The trial court also found that respondents did not follow up with a psychiatrist after his discharge from the Wright School as recommended, and failed to properly supervise Kirk "[t]o make sure that he does not hurt himself." These findings show that despite being aware of Kirk's mental health and behavior issues, respondents failed to provide
 
 *168
 
 adequate supervision and properly maintain Kirk's medication which caused his unbalanced behavior in early November. Even if inflicted by Kirk on himself, the injuries were nevertheless the result of physical harm "by other than accidental means" that respondents allowed to occur due to their failure to maintain Kirk's medication and provide adequate supervision to meet Kirk's special needs.
 

 The court also found that Kirk did not experience any substantial injuries in any of the placements outside of respondents' home. This
 
 *435
 
 finding shows that Kirk's other placements were able to provide proper supervision and prevent Kirk from causing any self-harm. It was only in respondents' care that Kirk was able to cause significant injury to himself. Therefore, the trial court's findings support the conclusions that Kirk was abused in that respondents created a substantial risk of physical injury to Kirk by other than accidental means, and that respondents inflicted or allowed to be inflicted on Kirk serious physical injury by other than accidental means.
 

 C. Adjudication of Neglect
 

 Finally, respondent-mother argues the trial court erred in adjudicating Kirk neglected because the evidence and findings of fact did not support such a conclusion. We disagree.
 

 A "neglected juvenile" is defined in relevant part as
 

 [a] juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare....
 

 N.C. Gen. Stat. § 7B-101(15) (2015).
 

 Respondent-mother first challenges Finding of Fact No. 26, in which the court found that respondents did not follow the discharge recommendations from the Wright School. However, the DSS social worker testified that part of Kirk's discharge plan from the Wright School recommended obtaining a psychiatrist for Kirk, which respondents did not do. As a result, Kirk did not have a doctor to refill his Prozac prescription, and the prescription lapsed for nearly two weeks. This is competent evidence to support the trial court's finding.
 

 Respondent-mother also challenges the trial court's Finding of Fact No. 32, in which it found that respondent-mother thought the frequent CPS reports resulted in her having a child in her home that she could not discipline, and that "it is unfortunate that [respondent-mother] does not recognize" that "[y]ou cannot beat incorrect behavior out of a child." However, because we deem this finding unnecessary to support the adjudication of neglect, we need not address this challenge as any error would not constitute reversible error.
 
 See
 

 In re T.M.
 
 ,
 
 180 N.C.App. 539
 
 , 547,
 
 638 S.E.2d 236
 
 , 240 (2006) ("When ... ample other findings of fact support an adjudication of neglect, erroneous findings unnecessary to the determination do not constitute reversible error." (citation omitted)).
 

 *436
 
 The remaining findings are sufficient to support the trial court's conclusion that Kirk is neglected. The trial court found that respondent-mother is "unable to meet [Kirk's] needs for appropriate discipline, or emotional and medical nurturing[,]" did not provide Kirk proper supervision to deal with his emotional difficulties and behavior issues, did not follow the discharge recommendations from the Wright School recommending Kirk see a psychiatrist, and allowed Kirk's prescription for Prozac to lapse for a period of two weeks. Dr. Herold testified at the hearing that "Prozac is not a medication that you want to just stop" and that doing so could cause side effects. These findings show that respondent-mother failed to provide proper supervision for Kirk and failed to keep his medication current.
 

 Additionally, in her brief respondent-mother admitted that the trial court's Findings of Fact Nos. 29-30 and 32-33 "tracked the definition of neglect" while arguing that they did not support an adjudication of abuse. We hold the trial court's findings support its conclusion that Kirk is a neglected juvenile in
 
 *169
 
 that respondents failed to provide proper supervision for Kirk.
 

 III. Conclusion
 

 For the reasons stated above, we affirm the trial court's adjudications of abuse, neglect, and dependency. Respondent-mother has not raised any issues on appeal pertaining to the disposition order.
 

 AFFIRMED.
 

 Judges HUNTER, JR. and ZACHARY concur.
 

 [1]
 

 A pseudonym is used to protect the juvenile's identity and for ease of reading.
 

 [2]
 

 Respondent-father did not appeal and is not a party to this appeal.