IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-868

Filed 16 April 2025

Forsyth County, No. 13 J 157

IN THE MATTER OF: A.D.W.

Appeal by Respondent-Father from orders entered on 24 June 2024 by Judge David E. Sipprell in Forsyth County District Court. Heard in the Court of Appeals 19 March 2025.

*Patricia M. Propheter for  Respondent-Father Appellant.*

*Forsyth County Department of Social Services, by Deputy County Attorney Theresa A. Boucher, for Petitioner-Appellee.*

*Poyner Spruill LLP, by Rohun S. Shah, for Guardian ad Litem, Petitioner-Appellee.*

WOOD, Judge.

Respondent-Father ("Father") appeals from the trial court's adjudication and disposition orders. The trial court adjudicated the juvenile abused and neglected and entered a disposition identifying reunification as the permanent plan. On appeal, Father argues the trial court erred by adjudicating the juvenile abused when evidence failed to prove abuse as defined by N.C. Gen. Stat. § 7B-101(1)(b) and by adjudicating the juvenile neglected where Father did his best to control the juvenile's diabetes.

For the reasons set forth below, we affirm the trial court's order.

## I.   Factual and Procedural Background

Andrew[1] was born on 23 May 2013.  He lived with Mother, Father, and his siblings after birth until he and his siblings were removed from the home.  From 5 July 2013 until March of 2015, Andrew and his siblings were in the custody of Forsyth County Department of Social Services ("DSS") due to concerns with Mother's mental health and her ability to care for the children as well as Father's inability to keep the children safe from Mother.  In 2014, at about thirteen months old, Andrew was diagnosed with Type 1 Diabetes.  After Andrew returned to his parents' care in March 2015, DSS received ten Child Protective Services reports necessitating family assessments resulting in case findings of services needed three times for in-home services to work with the family to address the concerns.

On 19 March 2023, DSS received a report alleging improper care of Andrew's medical needs after Andrew was admitted to the Intensive Care Unit ("ICU") with a blood sugar level of 966.  The report alleged that the parents were not providing appropriate medical care and were expecting nine-year-old Andrew to manage his own blood sugar and medication.

On 20 March 2023, a DSS social worker met with Andrew, his parents, and hospital staff.  It was noted that Andrew had been hospitalized three times in the

---

[1] A pseudonym is used to protect the identity of the juvenile pursuant to N.C. R. App. P. 42(b).

previous six months due to diabetic ketoacidosis. In addition, hospital staff determined he also has lipohypertrophy which impacts his body's ability to move insulin. Parents confirmed that Andrew was responsible for managing his diabetes and blamed him for his poor eating habits. Mother also reported that she has Bi-Polar Disorder and Schizophrenia for which she was not seeking treatment. After the 20 March meeting, Mother relocated to Mississippi, leaving Andrew in Father's care. Mother has not been actively involved in the family since that time and is not a party to this appeal.

During the Child Protective Services Family Assessment Father acknowledged that the power in the home had been cut off and that he was unemployed. The family's sole income was Andrew's Social Security income. Father refused support offered by the social worker including substance abuse treatment and help with transportation. Father continued to miss Andrew's medical appointments and Andrew was again hospitalized for diabetic ketoacidosis.

On 11 July 2023, the case was transferred to in-home services under a new social worker, Phillip Wilson ("Wilson"). At that time DSS recommended that Father complete drug screenings, restore and maintain electricity and utilities, attend parenting classes, and follow medical directives from Andrew's providers for the care and management of Andrew's diabetes. However, Father continued to miss medical appointments for Andrew including those on 14 July, 25 July, and 14 August 2023.

Also, on 14 August, Father tested positive for cocaine before entering into a Family Services Agreement in which he agreed to comply with the recommendations previously made by his DSS social worker.

On 5 October 2023, a Child and Family Team Meeting was held. Social worker Wilson and Father discussed a Temporary Safety Provider (TSP) for Andrew. Father agreed that Andrew would stay with a neighbor.

On 2 October, 11 October, and 23 October 2023 Andrew was admitted to the hospital due to diabetic ketoacidosis and elevated blood sugar. During the 23 October admission hospital staff reported that Father told Andrew, "you should have told me last night you needed insulin."

On 27 October 2023, Social Worker Hinson met with Andrew and the neighbor while Andrew remained hospitalized. Andrew reported he was still responsible for his medication, but it would be good to have an adult's help. The neighbor acknowledged that she was caring for Andrew but did not seem to understand her responsibility for his medical needs. Hinson explained the necessity of managing the juvenile's diet, medications and medical appointments and the neighbor stated she understood and would comply. Father requested a Dexcom 7 device, a continuous glucose monitoring system, be provided by hospital and DSS staff to assist in managing Andrew's diabetes. On 1 November 2023, Andrew was discharged from the hospital into the neighbor's care.

On 30 November 2023, Andrew completed a Child Medical Exam (CME) with Dr. Meggan Goodpasture. The doctor found that Andrew has had many admissions secondary to medical neglect. She also stated that "excessive training and education for all family members involved including father has been documented repeatedly in the medical record" and "[Andrew] continues to be at tremendous risk for serious bodily harm and death due to repeated medical neglect as documented over the years and reported to CPS in his medical record. His medical needs due to his [diabetes] are tremendous and require consistent and thorough care." Father was present for the CME but appeared to be under the influence of substances. He could not answer simple questions like how old he was or how many children he had. Dr. Goodpasture determined that Andrew's life was at risk because his diabetes was not being managed well.

Also on 30 November 2023, DSS received a second report alleging improper discipline, improper medical and remedial care, injurious environment and domestic violence. This report stemmed from an incident that occurred on 26 November 2023. Reportedly, Father was angry at Andrew because his blood sugar was high, so he hit him on the arm and leg with his hand, grabbed him by the shirt, threw him on the couch and slapped him on the head. Father was cursing and yelling during the incident. Andrew also reported that he did not feel safe with the neighbor because "she is fighting with a grown up and they use their bodies and words."

On 1 December 2023, Hinson met with Andrew and Father. Andrew was withdrawn during the meeting. Father reported that the incident in question did not occur as described, however he did admit to hitting and yelling at Andrew. He stated that he did not know how to get through to Andrew but if Andrew did not do what he needed to he was going to have to leave his dad and had nowhere else to go. The following week Hinson met with the neighbor who stated Andrew had reported to her the incident of being hit on his head by his father. Also, she admitted Andrew had been going to Father's house unsupervised.

On 27 December 2023, a Child and Family Team meeting was held with Father via teleconference regarding his non-compliance with the in-home services plan. Father became frustrated during the meeting and refused to engage. He stated that it was not his fault that Andrew sneaks food and eats food when he goes out in the neighborhood. When it was discussed that Andrew needs supervision, Father stated to the social worker, people need to sleep, and he cannot watch him all the time. Father acknowledged that he had hit Andrew but said it was "not like he punched him." Father was upset and stated he wanted Andrew back home but could not articulate any changes he would make to ensure Andrew's safety. He refused to discuss other placement options and was unaware of Andrew's next medical appointment. Father eventually hung up and did not participate further at that time. However, Father contacted Social Work Supervisor Coble ("Coble") within the

following forty-eight hours and decided to reengage in substance abuse treatment, random drug screens and comply with medical appointments.

On 29 December 2023, Coble completed a referral for a substance abuse assessment, mental health assessment, and parenting classes for Father. Also on 29 December, Coble met with the neighbor and Andrew. Andrew reported that it had been three days since he checked his blood sugar. The last check was 520. Coble asked Andrew to check his blood sugar, and his current level was 415. The neighbor denied being aware of Andrew's blood sugar level or that anyone had discussed with her the necessity of helping Andrew maintain a lower blood sugar level. In contrast, she acknowledged that both she and her niece were diabetic, and she was familiar with the process of diabetic care. She also stated that Andrew had lost his Dexcom 7. Coble contacted Father about Andrews' blood sugar level. When Father arrived, he asked Andrew what he had been eating and instructed him to use insulin. Andrew gave himself an insulin shot, and Father instructed him to wait thirty minutes and recheck. When Andrew rechecked, his level was 492. Coble asked Father to call EMS, but Father refused, instead instructing Andrew to use more insulin, this time in his leg instead of his arm. Coble again advised Father to call EMS and again he was hesitant. Eventually, Father called EMS, and Andrew was taken to the hospital where they were able to get his blood sugar stabilized.

On 2 January 2024, Father was supposed to take Andrew for a diabetes management appointment; however, he called to reschedule because he reportedly

overslept. Additionally, the neighbor determined that she no longer wanted to be a temporary placement because of "her hands being tied," so she returned Andrew to Father.

On 11 January 2024, Coble conducted a school visit and learned there were current concerns with elevated blood sugar levels now that Andrew was back at home. Additionally, the previous day Andrew missed the bus, googled the school phone number, and requested that someone come to get him. Coble then visited Father to discuss the new concerns. Father again blamed Andrew for his blood sugar levels. Additionally, Father stated that he would have to reschedule the substance abuse and mental health assessment that Coble had referred him to because he had a court date for a driving offense that conflicted with the scheduled date and time. Coble requested that Father take a drug screen, but Father admitted that he would test positive for cocaine as he had used the previous day.

Later in the day of 11 January 2024, the school contacted Coble and informed her that they were concerned about Andrew because he had shut down at school and written a note asking God to kill him. They were in the process of assessing his immediate medical needs and had contacted Father.

On 12 January 2024, DSS filed a petition alleging Andrew to be an abused and neglected juvenile. The trial court entered an Order for Nonsecure Custody 18 January 2024, and Andrew was placed with his maternal aunt ("Aunt").

On 19 January 2024, a Nonsecure Custody Hearing was held. Father attended the hearing but Mother's whereabouts were unknown. The trial court continued nonsecure custody with DSS and placement with Aunt as well as supervised visitation with Father once a week for an hour.

On 24 January 2024, another Nonsecure Custody Hearing was held. Father was present and Mother's location was still unknown. The trial court continued nonsecure custody with DSS and placement with Aunt and scheduled the adjudication hearing for 26 February 2024.

On 26 February, the adjudication hearing was continued by request of DSS as they needed additional time to issue subpoenas. The adjudication hearing was rescheduled for 10 May 2024.

On 10 May 2024, the trial court conducted an adjudication hearing. The trial court heard testimony from Dr. Goodpasture, DSS social workers, Father and the Guardian ad Litem and admitted various records, including the DDS and Guardian ad Litem reports. The trial court made numerous findings regarding Father's refusal to take responsibility for Andrew's medical needs despite DSS' repeated attempts to educate and train him as well as Andrew's continuously high blood sugar readings and hospitalizations from failure to manage his care. By order rendered on 10 May 2024 and filed 24 June 2024, the trial court adjudicated Andrew as abused and neglected. Father entered timely notice of appeal on 18 July 2024.

## II.  Analysis

Father asserts two arguments on appeal regarding the 24 June 2024 adjudication order. Father argues: (1) the trial court erred by adjudicating Andrew as an abused child when evidence failed to prove abuse as defined by N.C. Gen. Stat. § 7B-101(1)(b) and (2) the trial court erred by adjudicating Andrew as neglected when Father did his best to control Andrew's diabetes.

This Court reviews an adjudication of neglect and abuse to determine whether the findings of fact are supported by "clear and convincing evidence," and whether the trial court's findings support its conclusions of law. "If such evidence exists, the findings of the trial court are binding on appeal, even if the evidence would support a finding to the contrary." *In re L.C.*, 293 N.C. App. 380, 389, 900 S.E.2d 697, 706 (2024) (cleaned up). Any unchallenged findings of fact are binding on appeal. *Id.* Because Father has not challenged any findings of fact, all fifty-nine findings are binding on appeal.

We review a trial court's conclusions of law *de novo*. *Id.* "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the [trial court]." *In re K.S.*, 380 N.C. 60, 64, 868 S.E.2d 1, 4 (2022) (cleaned up). "The determination that a child is 'neglected' [or 'abused'] is a conclusion of law we review de novo." *In re L.C.*, 293 N.C. at 389, 900 S.E.2d at 706.

**A. Adjudication of Abuse**

Father contends that the ongoing lack of appropriate care for a life-threatening medical condition does not meet the requirements of N.C. Gen. Stat. § 7B-101(1)(b).

We disagree.

> N.C. Gen. Stat. § 7B-101(1)(b) reads:
>
> > (1) Abused juveniles.--Any juvenile less than 18 years of age (i) who is found to be a minor victim of human trafficking under G.S. 14-43.15 or (ii) whose parent, guardian, custodian, or caretaker:
> >
> > b. Creates or *allows to be created a substantial risk* of *serious physical injury* to the juvenile by other than accidental means . . .

(emphasis added).

DSS and the Guardian ad Litem argue that Father: (1) allowed to be created a substantial risk of (2) serious physical injury when he repeatedly refused to monitor and medicate Andrew's type 1 diabetes causing repeated hospitalizations for diabetic ketoacidosis, which resulted in end organ damage.

This Court has repeatedly held that when the parent is aware of the existence of the risk and "fail[s] to take the necessary steps to protect [the] minor" the element of "allow[s] to be created a substantial risk" under N.C. Gen. Stat. § 7B-101(1)(b) is met. *In re W.C.T.*, 280 N.C. App. 17, 28, 867 S.E.2d 14, 22 (2021); *In re M.G.,* 187 N.C. App. 536, 549, 653 S.E.2d 581, 589 (2007), *rev'd in part on other grounds,* 363 N.C. 570, 681 S.E.2d 290 (2009).

The juvenile code does not contain a definition for the term "serious physical injury" with respect to chapter 7B. However, this Court has utilized the definition provided by N.C. Gen. Stat. § 14-318.4, the felony child abuse statute. *In re L.T.R.*,

181 N.C. App. 376, 381, 639 S .E.2d 122, 125–26 (2007). "Under N.C. Gen. Stat. § 14-318.4, a 'serious physical injury' is defined as an injury that causes 'great pain and suffering.' " *State v. Romero,* 164 N.C.App. 169, 172, 595 S.E.2d 208, 210 (2004) (cleaned up). Additionally, Black's Law Dictionary defines an "injury" as "[a] ny harm or damage," and defines "physical" or "bodily" injury as "[p]hysical damage to a person's body." *Black's Law Dictionary* (12th ed. 2024).

In an unpublished yet persuasive opinion, this Court has previously held that a heart attack caused by severe malnourishment met the criteria for a serious physical injury and when the father "saw the problem, and realized it was a problem, and they failed to get the child . . . to health care professionals" it supported the adjudication of abuse. *In re D.L.,* 213 N.C. App. 217, 714 S.E.2d 209 (2011) (unpublished).

Similarly, in *In re K.B.*, this Court upheld a trial court's determination of abuse when a parent failed to medicate and supervise their child, and that failure resulted in the child inflicting serious self-harm. *In re K.B.*, 253 N.C. App. 423, 434-35, 801 S.E.2d 160, 168 (2017). This Court held, "[the child] was abused in that respondents created a substantial risk of physical injury to [the child] by other than accidental means, and that respondents inflicted or allowed to be inflicted on [the child] serious physical injury by other than accidental means." *Id.* at 435, 801 S.E. 2d at 168.

In the case *sub judice,* the trial court heard extensive testimony from Dr. Meggan Goodpasture and admitted medical reports based on that testimony. Dr.

Goodpasture testified that Andrew suffers from Type 1 diabetes mellitus and has been admitted to the intensive care unit many times due to Father's failure to monitor Andrew's diet, blood sugar, and medication administration. Due to these repeated hospitalizations, Dr. Goodpasture stated that Andrew has been "close to death on multiple occasions" and has had "end organ damage and complication[s]" such as acute kidney injuries. The doctor testified that Andrew is at high risk for death and further organ damage including damage to his kidneys, brain, eyes and nerves.

In addition, the trial court made multiple findings concerning the numerous times that medical and DSS staff met with Father and educated him concerning the need for serious and continuous adult monitoring of Andrew's blood sugar levels and insulin usage as well as the serious risks to Andrew's life and health if that monitoring and medication administration fails. However, Father repeatedly refused to take responsibility and repeatedly blamed Andrew, a ten-year old child, for his inability to care for himself.

These unchallenged findings of fact illustrate the abundance of evidence, including testimony and reports from medical providers and DSS staff, which provide clear and convincing evidence that Father was aware of the risk associated with Andrew's type 1 diabetes being unmonitored and failed to take any of the necessary steps to protect Andrew. Father's inaction resulted in near death and acute kidney damage that caused Andrew "great pain and suffering" requiring the juvenile to be in the intensive care unit for multiple days on multiple occasions. We affirm the trial

court's conclusion that Andrew met the statutory criteria of an abused juvenile.

## B. Adjudication of Neglect

Father argues the trial court erred by adjudicating Andrew as neglected when Father did his best to control Andrew's diabetes; however, Father does not challenge any of the trial court's findings. Based on a thorough review of the uncontested findings of fact by the trial court, this argument is without merit.

N.C. Gen. Stat. § 7B-101(15) reads in pertinent part:

> 15) Neglected juvenile.--Any juvenile less than 18 years of age (i) who is found to be a minor victim of human trafficking under G.S. 14-43.15 or (ii) whose parent, guardian, custodian, or caretaker does any of the following:
>
> a. Does not provide proper care, supervision, or discipline.
> . . .
> c. Has not provided or arranged for the provision of necessary medical or remedial care.
> . . .
> e. Creates or allows to be created a living environment that is injurious to the juvenile's welfare.

"[I]n concluding that a juvenile lives in an environment injurious to the juvenile's welfare, N.C. [Gen. Stat.] § 7B-101(15), the clear and convincing evidence in the record must show current circumstances that present a risk to the juvenile." *In re J.A.M.*, 372 N.C. 1, 9, 822 S.E.2d 693, 698 (2019). Further, the Supreme Court stated, "[i]n order to adjudicate a juvenile neglected, our courts have additionally required that there be some physical, mental, or emotional impairment of the juvenile *or a substantial risk of such impairment* as a consequence of the failure to provide

'proper care, supervision, or discipline.' " *Id.* Specifically, neglect has been found in cases where "the conduct at issue constituted either severe or dangerous conduct or a pattern of conduct either causing injury or potentially causing injury to the juvenile." *In re Stumbo*, 357 N.C. 279, 283, 582 S.E.2d 255, 258 (2003).

In the case *sub judice,* the trial court made numerous findings by clear and convincing evidence that Father continuously failed to monitor Andrew's blood sugar and insulin use which resulted in serious near-death injuries. Specifically, the trial court found:

> 14. On or about March 19, 2023, Forsyth County Department of Social Services (FCDSS) received a Child Protective Services report alleging improper care, and improper medical/remedial care. [Andrew] was not receiving proper medical care for his Type 1 Diabetes; his parents were not giving him insulin appropriately or regularly. [Andrew] was being admitted to the ICU due to his blood sugar being 966. Reportedly, his parents expected [Andrew] to manage his blood sugar and medication, which is not appropriate for a 9 year old.

> 15. FCDSS social worker Janet Riley-Wright met with [Andrew], his mother [ ], his father [ ], and hospital staff on March 20, 2023, and confirmed that [Andrew] was not receiving the appropriate medical care for his diabetes. As of that date, [Andrew] had been hospitalized three times in the previous six months due to Diabetes Ketoacidosis (DKA). Additionally, medical staff stated he had Lipohypertrophy, which is the condition that involves insulin settling in frequently injected areas and not traveling through the body appropriately. [Mother] and [Father] confirmed that [Andrew] was in charge of managing his diabetes and blamed him for his poor eating habits. Additionally, his parents were not consistent with [Andrew's] medical appointments. They also blamed the

current hospitalization on [Andrew] going to a birthday party at a friend's house, but [Father] could not remember the name of the woman who hosted the party. . . .

17. . . . During in Home Services, [Father] missed several medical appointments; July 14, July 25 and on August 14, 2023. . . .

19. On or about October 2, 11, and 23, [Andrew] was admitted to Brenner Children's Hospital due to Diabetes Ketoacidosis and his blood sugar levels being elevated.

20. . . . on October 23, 2023, . . . [Father] was heard saying to [Andrew] "you should have told me last night you needed insulin."

23. On or about November 30, 2023, [Andrew] completed a Child Medical Exam (CME) with Dr. Meggan Goodpasture. Dr. Goodpasture's evaluation found that [Andrew] has had many admissions secondary to medical neglect, and multiple life-threatening events due to the medical neglect. She also stated that "excessive training and education for all family members involved including father has been documented repeatedly in the medical record." Dr. Goodpasture concluded that "[Andrew] continues to be at tremendous risk for serious bodily harm and death due to repeated medical neglect as documented over the years and reported to CPS in his medical record. His medical needs due to his DM are tremendous and require consistent and thorough care."

24. On or about November 30, 2023, FCDSS received a second report alleging improper discipline, improper medical/remedial care, injurious environment, and domestic violence. On Sunday, November 26, 2023, [Father] was mad at [Andrew] because his blood sugar was high, so [Father] hit him on the arm and leg with his hand. [Father] also grabbed the child by the shirt and threw him on the coach and slapped him on the head. [Father] was cursing and yelling at him and stated, "you must want me to go to jail."

27. On or about December 27, 2023, a Child and Family Team meeting was held with [Father] regarding his non-compliance with the In-Home Services plan to ensure [Andrew's] safety. [Father] became frustrated during the meeting and refused to engage. [Father] again stated that it's not his fault [Andrew] sneaks food and eats what he wants when he goes out in the neighborhood. When it was discussed that he needs supervision, [Father] responded that people need to sleep and he cannot watch him all the time. When the concerns from the CME were discussed, [Father] acknowledged he hit [Andrew] in the head but said it was not like he punched him. [Father] became verbally upset during the meeting and said he wanted his son back home. [Father] could not state anything he would do differently to ensure his son was safe in his home. . . . When asked about [Andrew's] next appointments, [Father] said he did not know when they were and did not know how to log into MyChart to figure it out. . . .

28. On or about December 29, 2023 social work supervisor Coble met with [neighbor] regarding [Andrew] and asked [Andrew] when the last time he checked his blood sugar; [Andrew] reported it was three days ago and was at his brother, [ ] house. Social work supervisor Coble observed the last blood sugar level was 520. Social work supervisor Coble asked [Andrew] to check while she was present, and the blood sugar level was 415. . . . Social work supervisor Coble contacted [Father] about [Andrew's] blood sugar level. Upon arrival, [Father] asked [Andrew] what he had been eating and instructed him to use his insulin. . . . Social work supervisor Coble observed as [Andrew] gave the insulin shot in his right arm. [Father] instructed [Andrew] to wait 30 minutes and recheck his blood sugar levels. When it was checked again, it was 492. Social work supervisor Coble asked [Father] to contact EMS; at first [Father] refused to call EMS and advised [Andrew] to use his insulin again in his leg, instead of his arm. Social work supervisor Coble advised [Father] to contact EMS due to life threatening blood sugar levels. [Father] was hesitant but contacted EMS. Social work supervisor Coble waited

> for EMS. Upon arrival, [Andrew] was take to Brenner
> Children's Hospital for further evaluation. . . . [Father]
> was supposed to take [Andrew] to a diabetes management
> appointment on January 2, 2024, but called and
> rescheduled the appointment until January 23, 2024.
> [Father] reported that he overslept and was unable to
> attend this appointment.

These findings support the trial court's conclusion that Andrew meets the criteria under N.C. Gen. Stat. § 7B-101(15) as a neglected juvenile. Father was repeatedly informed of the risks associated with Andrew's diabetes not being monitored by an adult, was taught how to monitor and medicate him, witnessed the repeated hospitalizations required when Andrew suffered from diabetic ketoacidosis as a result of dangerously high blood sugar levels and still refused to accept responsibility for the monitoring and management of his son's serious medical condition. This clearly constituted a pattern of conduct that both caused injury and potentially would cause further injury to the juvenile.

### III.    Conclusion

The trial court made fifty-nine uncontested findings of fact which adequately support by clear and convincing evidence its conclusions that the juvenile is abused and neglected. When a parent is aware of their child's serious medical issue and fails to provide or acquire the necessary medical care, which causes injury to the child and places the child at risk of serious physical harm or death, this failure can constitute both abuse and neglect of the child. Accordingly, we affirm the trial court's

adjudication order.

AFFIRMED.

Judges ARROWOOD and FLOOD concur.