IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-559

No. COA21-178

Filed 19 October 2021

Alamance County, Nos. 20 JA 126, 20 JA 127, 20 JA 128

IN THE MATTER OF:

W.C.T., W.J.A.T., & W.D.T.

Appeal by respondents from order entered 17 December 2020 by Judge Kathryn W. Overby in Alamance County District Court. Heard in the Court of Appeals 11 August 2021.

*Wendy Walker for Petitioner-Appellee Alamance County Department of Social Services.*

*Office of the Parent Defender, by Parent Defender Wendy C. Sotolongo and Assistant Parent Defender J. Lee Gilliam, for Respondent-Appellant-Mother.*

*Edward Eldred for Respondent-Appellant-Father.*

*Forrest Firm, P.C., by Brian C. Bernhardt, for Guardian ad Litem.*

CARPENTER, Judge.

¶ 1  Respondent-Mother and Respondent-Father (collectively "Respondents") appeal from the trial court's Adjudication and Disposition Order adjudicating minor child, Wade,[1] as an abused, neglected, and dependent juvenile; adjudicating the other

---

[1] Pseudonyms have been used to protect the identities of the children.

two minor children, Wes and Wren, as neglected and dependent juveniles; and vesting custody of the children with Alamance County Department of Social Services ("ACDSS"). Respondents argue the trial court erred in adjudicating Wade abused and dependent, and adjudicating Wes and Wren dependent. Respondent-Mother also argues the trial court abused its discretion by limiting her visitation with the children to highly supervised, one-hour weekly visits; requiring proof of income; and ordering her to "refrain from allowing mental health to impact parenting." Finally, Respondent-Mother contends the trial court erred in concluding she acted inconsistently with her constitutionally protected status as a parent. For the reasons set forth below, we affirm the Adjudication and Disposition Order.

## I. Factual & Procedural Background

Respondent-Mother and Respondent-Father are the biological parents of three children: "Wes," eight years old; "Wren," three years old; and "Wade," one year old. Respondent-Mother is legally married to her estranged husband, Peter,[2] and was married to, but separated from, Peter prior to the births of the three children. Peter is not a party to this appeal.

On 12 March 2020, Wade, then three months old, was taken to Moses Cone Hospital for second and third degree burns on 8.3% of his left thigh, left calf, and left

---

[2] A pseudonym has been used.

foot. Immediately after arriving to Moses Cone Hospital, Wade was transferred to Wake Forest Baptist Medical Center/Brenner Children's Hospital ("BCH") for treatment by its burn team. The injury was not witnessed, and the parties have offered multiple, inconsistent, and implausible stories to explain the circumstances surrounding the child's injury.

¶ 4        Respondents reported to Moses Cone Hospital staff that Wade was in a baby swing or rocker downstairs when their German Shepherd dog knocked over the swing. Respondents alleged that Wade fell out of the swing and was pushed up against an electrical space heater for what they estimated was approximately thirty minutes; they reported finding him laying against the heater. Respondents claimed to have immediately transported Wade to the hospital after discovering his injuries. Respondents also told this story to both BCH staff and a Forsyth County Department of Social Services ("FCDSS") social worker who interviewed them on 13 March 2020. During the interview with the social worker, Respondent-Mother admitted Wade was not yet able to roll over at the time of injury.

¶ 5        BCH triage notes indicate the "burn distribution is consistent w[ith the] story" Respondents told. The notes also document concerns regarding: the child being left unattended by a heater, the thirty- to forty-minute period for which Respondents could not account, how a dog knocked over the swing, why the space heater was left on during a hot day, and why the parents did not immediately hear the child's cries.

The initial screening for domestic violence, abuse, and neglect did not raise concerns; however, child abuse protocol was initiated by BCH on 13 March 2020 at 2:30 a.m. after BCH received an anonymous phone call from someone who claimed to be familiar with Respondent's family and sought the case be reported to Child Protective Services ("CPS"). The caller claimed to have recordings of the paternal grandmother threatening Wade the day of his injury. The caller also stated that the paternal grandmother often leaves the children unattended and claimed Respondent-Mother was at risk for abuse. The attending physician referred Wade for a consultation with Dr. Meggan Goodpasture of the BCH Pediatric Child Protection team. Dr. Goodpasture met with the maternal grandmother and Respondent-Father. Although the maternal grandmother expressed safety concerns in her meeting with Dr. Goodpasture, the family had no subsequent meetings with the doctor because Respondent-Father advised BCH that he did not want Dr. Goodpasture in Wade's hospital room again. Based on Dr. Goodpasture's initial consultation, she recommended, *inter alia*, CPS and law enforcement reconstruct the scene of the injury and perform full child medical evaluations on each of the three children.

¶ 6 Guilford County Department of Social Services ("GCDSS") received a report for physical abuse concerning Wade on 13 March 2020. Later that day, GCDSS sent a request to FCDSS to assist in the investigation. Social Worker Pope of FCDSS interviewed nurse staff of BCH as well as the Respondents. After Social Worker Pope

left Wade's hospital room, Respondent-Father stated to the attending nurse, Nurse Green, that the social worker told him the burn was caused by boiling water. He then became "visibly upset" and stated, "I feel like I'm being accused of a crime that I did not commit." Respondent-Father indicated an unidentified staff member in scrubs had also commented the burn was "from boiling water." Nurse Green was able to "diffuse the situation" by indicating physicians did not have suspicions of Respondents' story, Respondent-Father became more at ease and mentioned he has post-traumatic stress disorder ("PTSD") from being "burned and abused" by his own father, which caused him to distrust "the system." Neither the emergency department notes, nor the social workers' reports state the burn was caused by boiling water.

¶ 7    On 27 March 2020, Dr. John Bailey of the BCH burn team entered a progress note regarding Wade's case. He documented he and Dr. Goodpasture agreed Wade "appear[ed] to have suffered a contact burn." He also noted that neither of the doctors could "offer more than a speculation regarding the true mechanism [of the injury], although involvement of the pet seems less likely."

¶ 8    On 1 April 2020, a Child and Family Team meeting was held between GCDSS, Respondent-Mother, and Respondent-Father. At the meeting, Respondents agreed to enter a safety agreement whereby the children would be placed with the maternal grandparents as a temporary safety provider, Respondents would not have

unsupervised visits or overnight stays with the children, and Respondents would receive mental health services. Wade was discharged from BCH into the maternal grandparents' care the following day.

¶ 9     On 2 April 2020, another Child and Family Team meeting was held via conference call with Respondents, GCDSS, and the paternal grandmother, and Krispen Culberton ("Attorney Culberton")—attorney for Respondents' family. Attorney Culberton reported Respondents' concerns for Wren's behavior and her aggression towards Wade. According to Attorney Culberton, Respondents were afraid to report they believed Wren caused Wade's injuries. The paternal grandmother claimed at the meeting she was the sole caretaker of the juveniles when Wade was injured. According to the paternal grandmother's version of events, she fed Wade and laid him in his bassinet, she put Wren down in her playpen, and she went downstairs to prepare dinner. She later sent Wes upstairs to check on Wren and Wade. Immediately after, Wes came running downstairs screaming Wade had been burned. The paternal grandmother speculated that Wren climbed out of her playpen, pulled Wade out of his bassinet, and climbed back into her playpen. Following the injury, the paternal grandmother treated Wade's burns with Vaseline before taking him to the hospital. Respondents adopted this story and later reported this account of events to Detective Gerald Austin ("Detective Austin") of the Guilford County Sheriff's Department, who handled the criminal investigation into Wade's

injury.

¶ 10        On 16 April 2020, a child medical evaluation was performed on each of the three children by Dr. Esther Smith of the Cone Health Child Advocacy Medical Clinic, as recommended by Dr. Goodpasture. In Dr. Smith's opinion, "it is possible that [Wade's] injuries are consistent with having been burned by prolonged direct or near-direct contact with [Respondents'] space heater"; however, she noted "there is a very high concern for [an i]ntentional[ly i]nflicted injury (at worst) . . . and/or [n]eglect resulting in [an u]nintentional [i]njury (at best)." She expressed concerns for the red flags identified by BCH as well as concerns for the "very unsafe infant sleep environment" which included lack of supervision, close proximity to a heat source, suffocation risk due to excess blankets in bassinet, and potential fall risk due to a cradle that may have been improperly assembled.

¶ 11        In May of 2020, the case was transferred from GCDSS to ACDSS due to a potential conflict of interest that arose after Respondent-Father and his attorney threatened to sue GCDSS and/or its employees over an alleged HIPAA violation.

¶ 12        On 21 July 2020, concerns arose regarding the kinship placement with the maternal grandparents when ACDSS social workers arrived at the maternal grandparents' home unannounced and found the maternal grandmother overwhelmed with caring for the children. The maternal grandmother admitted that she was frustrated by Respondents' tardiness to scheduled visitations. She also

admitted to "backhand[ing]" Wren after Wren spit in her face. ACDSS immediately terminated the kinship placement and advised Respondents that a replacement temporary safety provider was needed.

¶ 13 On 21 July 2020, the children were placed with a neighbor of the maternal grandparents who agreed to be a temporary placement until 21 August 2020. Respondents gave ACDSS the name of another family for a potential placement. However, one of the proposed caretakers of the new family was an employee of ACDSS so the agency concluded the family was ineligible due to a conflict of interest. In August of 2020, ACDSS received multiple phone calls from individuals who claimed Respondents were seeking potential placements off the street and through social media. ACDSS held a Child and Family Team meeting with Respondents on 21 August 2020 to inform them that the agency would need to seek court involvement if Respondents could not provide a viable placement option. After Respondents did not provide an alternative placement, ACDSS informed the parents that it would be filing a non-secure order for custody of the children.

¶ 14 On 21 August 2020, ACDSS filed a petition alleging Wade was an abused, neglected, and dependent juvenile, and petitions alleging Wes and Wren were neglected and dependent juveniles. The petitions alleged, *inter alia*: (1) "that [Wade's] parents and/or caretaker have inflicted or allowed to be inflicted serious physical injury, possible by other than accidental means and/or created a serious risk

of physical injury by other than accidental means"; (2) that "[t]he juveniles have been neglected in that the juveniles do not receive appropriate care, supervision, or discipline from their parents and/or caretaker"; (3) "[t]hat the parents do not have an appropriate plan of care for the juveniles"; and (4) "[t]hat the juveniles would be at significant risk of harm if placed with the parents and/or paternal grandmother."

¶ 15        On 21 August 2020, the Alamance County District Court issued orders for nonsecure custody of the three children, finding a reasonable factual basis to conclude the children were exposed to a substantial risk of physical injury.  The court ordered the children placed in nonsecure custody with ACDSS and set a hearing on 26 August 2020 to determine the need for continued nonsecure custody.  ACDSS obtained nonsecure custody of the children and placed them together in a foster home in Moore County.

¶ 16        On 26 August 2020, a hearing was held before the Honorable Kathryn W. Overby to determine the need for continued non-secure custody of the children. Following the hearing, Judge Overby entered an order on 16 September 2020 finding, *inter alia*, that the juveniles' return to their own home would be contrary to the best interests of the juveniles, and mandating, *inter alia*, that temporary custody of the juveniles be continued in ACDSS for non-secure placement.

¶ 17        An adjudication hearing was held between 18 November 2020 and 20 November 2020 before Judge Overby.  Testimony was given by two social workers

familiar with the case, Respondent-Mother, Respondent-Father, the maternal grandmother, a co-worker of Respondent-Mother, Detective Austin, and the guardian *ad litem* for the children.

¶ 18     Detective Austin testified he investigated the case after he became aware through BCH that a child "suffered burns under suspicious circumstances . . . ." Detective Austin spoke with Respondent-Mother and Respondent-Father while they were visiting BCH on 18 March 2020, to make them aware of his investigation. Respondent-Father used a recording device to record his conversation with Detective Austin and advised he had an attorney.

¶ 19     Detective Austin testified he obtained a search warrant to search Respondents' home and executed the search warrant on 19 March 2020. Two GCDSS social workers accompanied him during his search of the home. Detective Austin testified he seized the space heater that was alleged to have been the mechanism of the injury and took photographs of Respondents' home. He later performed tests on the heater using a "calibrated thermometer to record temperatures at . . . different points" of the heater. He determined that at the vents of the heater, the temperature fluctuated between 178.7- and 248.6-degrees Fahrenheit, rather than keeping a steady temperature. The vents were the warmest points of the heater. Following Detective Austin's investigation, Respondent-Father, Respondent-Mother, and the paternal grandmother were charged with and arrested for felony negligent child abuse

resulting in serious bodily injury.

¶ 20        Respondent-Mother testified as to the events of 12 March 2020. According to Respondent-Mother, she called her mother to pick her up because Respondent-Father took the truck she had driven to work, to get it fixed and inspected, and he was not answering his phone. Respondent-Mother testified she left the store between 5:00 p.m. and 5:30 p.m. When asked why she gave multiple stories regarding Wade's injury, Respondent-Mother responded that she and Respondent-Father "panicked," and "were terrified that something was going to happen to [Wren]."

¶ 21        The maternal grandmother testified that Respondent-Mother called her upset and crying at about 4:00 p.m. on 12 March 2020 and told her mother she did not have a ride home; the maternal grandmother agreed to pick up Respondent-Mother at the end of her shift. Shortly after 5:00 p.m., Respondent-Mother called the maternal grandmother to tell her she was ready to be picked up. When the maternal grandmother arrived around 5:30 p.m., Respondent-Mother stated, "she did not want to go back home" and requested to go to the maternal grandmother's house instead. Respondent-Mother told the maternal grandmother that Respondent-Father and the paternal grandmother leave the children alone, and Respondent-Mother has found the children alone when she has come home from work. At approximately 6:00 p.m., Respondent-Father arrived at the maternal grandmother's house. Respondents spoke in the driveway for approximately two hours regarding "some incidents that

were happening at the store" where Respondent-Mother worked. The maternal grandmother testified that Respondent-Father's phone "kept ringing," and he "eventually . . . tossed it over into the yard . . . ." When Respondent-Mother was asked at the hearing if she was arguing with Respondent-Father at the maternal grandmother's home on the evening of 12 March 2020, Respondent-Mother stated they were discussing her job because she was trying to have the district manager transfer her co-worker "Robert,"[3] who had been "making sexual advances towards" her.

¶ 22      The record reveals the paternal grandmother called Respondent-Father eighteen times between 7:01 p.m. and 7:52 p.m. and Respondent-Father answered just one of her calls at 7:52 p.m. Respondent-Father then "hurried [Respondent-M]other home without telling her the nature of the phone call." The maternal grandmother's testimony indicates Respondents left her home between 8:00 p.m. and 8:20 p.m. According to Respondent-Mother, she and Respondent-Father arrived at their home at about 8:15 p.m. Respondent-Mother testified Wade was not crying when they got home. She took him upstairs to look at his burns. Shortly thereafter, Respondents took Wade to the hospital.

¶ 23      Respondent-Mother's co-worker Robert testified regarding events that had

---

[3] A pseudonym has been used.

transpired at the store and incidents in which Respondent-Mother had confided in him. According to Robert, he would "hear things from other people" about Respondent-Mother and would ask Respondent-Mother if they were true. On one such instance, Robert asked Respondent-Mother if the paternal grandmother "had pulled a gun on her when [Wes] was a young boy . . . and told [Respondent-Mother] that she would hurt her and no one would ever find her," while the two were in the presence of Wes. Robert testified Respondent-Mother confirmed this incident had occurred. Robert also testified to speaking with Respondent-Mother the day of Wade's injury. Respondent-Mother told him that just the day before, on 11 March 2020, "she . . . went home and the kids were at home by [themselves], and it was a couple hours later that [the paternal grandmother] and [Respondent-Father]" arrived home. On the day of 12 March 2020, Robert testified he saw Respondent-Father and the paternal grandmother behind the store dumping their personal trash in the store's dumpster. He did not see the three children in the pickup truck. Later that day, Robert overheard the store's manager on duty taking a call from the paternal grandmother. Robert testified he could hear the paternal grandmother through the phone using obscenities referring to the Respondent-Mother and stating, "[Respondent-Mother] needs to come home and take care of her children or someone would take care of them for her."

¶ 24        An initial disposition hearing was held before Judge Overby on 20 November

2020 following the adjudication hearing. After the presentation of all evidence, the trial court announced its judgment in open court and ordered custody of the juveniles be vested with ACDSS. On 17 December 2020, the trial court entered the Adjudication and Disposition Order in which it made factual findings supported by clear and convincing evidence to conclude Respondents and/or a caretaker inflicted or allowed to be inflicted serious physical injury possible by other than accidental means and/or created a serious risk of physical injury by other than accidental means, Respondents and/or a caretaker did not provide appropriate care or supervision for the juveniles, and Respondents and/or a caretaker created an injurious environment placing the juveniles at substantial risk of harm. The trial court also concluded Wade is an abused, neglected, and dependent juvenile, and Wes and Wren are neglected and dependent juveniles. Respondent-Mother and Respondent-Father each filed timely notices of appeal from the Adjudication and Disposition Order.

## II. Jurisdiction

This Court has jurisdiction to address Respondent-Father's and Respondent-Mother's appeals from the Adjudication and Disposition Order pursuant to N.C. Gen. Stat. § 7A-27(b)(2) (2019) and N.C. Gen. Stat. § 7B-1001(a)(3) (2019).

## III. Issues

On appeal, Respondent-Mother and Respondent-Father raise two common issues: (1) whether the trial erred in adjudicating Wade an abused juvenile; and (2)

whether the trial court erred in adjudicating Respondents' three children dependent juveniles. Respondent-Mother raises three additional issues: (1) whether the trial court erred in ordering Respondent-Mother to show proof of income and to refrain from allowing mental health to impact parenting as steps to remedy the conditions in the home that led to the juveniles' adjudications; (2) whether the trial court abused its discretion in limiting Respondent-Mother's visitation with the children to highly supervised, one-hour weekly visits; and (3) whether the trial court erred in concluding Respondent-Mother had acted inconsistently with her constitutionally protected parental status.

## IV. Adjudication

### A. Standard of Review

¶ 27        "The allegations in a petition alleging that a juvenile is abused, neglected, or dependent shall be proved by clear and convincing evidence." N.C. Gen. Stat. § 7B-805 (2019). "When reviewing a trial court's order adjudicating a juvenile abused, neglected, or dependent, this Court's duty is 'to determine (1) whether the findings of fact are supported by clear and convincing evidence, and (2) whether the legal conclusions are supported by findings of fact.'" *In re F.C.D.*, 244 N.C. App. 243, 246 780 S.E.2d 214, 217 (2015) (quoting *In re T.H.T.*, 185 N.C. App. 337, 343, 648 S.E.2d 519, 523 (2007) (citation, quotation marks, and brackets omitted), *aff'd as modified*, 362 N.C. 446, 665 S.E.2d 54 (2008)). "If supported by competent evidence, the trial

court's findings are binding on appeal even if the evidence would also support contrary findings." *Id.* at 246, 780 S.E.2d at 217 (citation omitted). Unchallenged findings of fact are deemed supported by competent evidence and binding on appeal. *In re J.M.W.*, 179 N.C. 788, 792, 635 S.E.2d 916, 919 (2006) (citation omitted). The determination of whether a child is abused, neglected, or dependent is a conclusion of law. *In re Ellis*, 135 N.C. App. 338, 340, 520 S.E.2d 118, 120 (1999). The trial court's conclusions of law are reviewed *de novo*. *In re Pope*, 144 N.C. App. 32, 40, 547 S.E.2d 153, 158 (citation omitted), *aff'd*, 354 N.C. 359, 554 S.E.2d 644 (2001).

## B. Adjudication of Abuse

### 1. *Findings of Fact regarding Abuse*

On appeal, Respondent-Mother argues the trial court erred in adjudicating Wade abused on the basis there was no clear and convincing evidence that the injuries were "other than accidental." Similarly, Respondent-Father contends "[t]he trial court's evidentiary findings of fact do not support the ultimate finding that Wade's injury was non-accidental"; rather, the findings establish that the injury was "caused by a 'lack of supervision.'"

The Juvenile Code defines an "abused juvenile" in pertinent part as

> [a]ny juvenile less than 18 years of age . . . whose parent, guardian, custodian, or caretaker:
>
> a. [i]nflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means;

[or]

b. [c]reates or allows to be created a substantial risk of serious physical injury to the juvenile by other than accidental means.

N.C. Gen. Stat. § 7B-101(1)(a)-(b) (2019).

"This Court has previously upheld adjudications of abuse where a child sustains non-accidental injuries, even where the injuries were unexplained." *In re J.M.*, 255 N.C. App. 483, 495, 804 S.E.2d 830, 838–39 (2017); *see In re T.H.T.*, 185 N.C. App. 337, 648 S.E.2d 519 (2007) (affirming an abuse adjudication where a physician concluded a child's skull fracture was caused by non-accidental means, the mother's explanations were not consistent with the injuries observed, and the mother failed to seek medical attention for the child). Additionally, this Court has held that a respondent mother's knowledge of a substantial risk of serious physical injury posed to her children was sufficient to conclude that respondent "allowe[d] to be created a substantial risk of serious physical injury to the juvenile[s] by other than accidental means." *In re M.G.*, 187 N.C. App. 536, 549, 653 S.E.2d 581, 589 (2007), *rev'd in part on other grounds*, 363 N.C. 570, 681 S.E.2d 290 (2009) (upholding an abuse adjudication where the respondent mother knew of the respondent father's violent and abusive nature and "failed to take the necessary steps to protect [her] minor children"). As our Court stated in *In re K.L.*, the exact cause of a child's injury may be unclear in a case involving an adjudication of abuse; however, if the trial court's

findings of fact support the inference the respondents are responsible for the unexplained injury by clear and convincing evidence, the abuse adjudication will be affirmed. 272 N.C. App. 30, 40, 845 S.E.2d 182, 191, *disc. rev. denied*, 2020 N.C. LEXIS 1353 (2020).

¶ 31    In the instant case, the trial court concluded Respondents had "inflicted or allowed to be inflicted serious physical injury, possible by other than accidental means and/or created a serious risk of physical injury by other than accidental means" and "did not provide appropriate care or supervision for the juveniles and created an injurious environment placing the juveniles at substantial risk of harm." The trial court made the following pertinent findings of fact, which support its adjudication of abuse:

> 27.    On March 12, 2020, the respondent parents along with the three juveniles lived with . . . the respondent father's mother (paternal grandmother to the juveniles) . . . .
>
> 28.    The respondent mother was employed . . . and worked approximately sixty (60) hours each week,
>
> 29.    The respondent father was not employed. He indicated to hospital employees that he has post-traumatic stress disorder (PTSD).
>
> 30.    The respondent mother told co-worker [Robert] and her mother . . . that she had found [her children] alone and unsupervised on March 11, 2020 when she came home from work. She had no idea how long the juveniles had been left alone in the home.
>
> 31.    On March 12, 2020 the respondent mother told [Robert] and her mother that she was upset about finding the juveniles alone the day before.

32. The respondent mother told Robert and her mother that [the paternal grandmother] had held a gun to her while she was holding [Wes] as an infant. She reported that this was due to [the paternal grandmother] not taking her medication.

33. On July 14, 2018, the respondent parents spoke to a clinical social worker and the respondent mother noted that [the paternal grandmother] "can be verbally abusive to her" due to [the paternal grandmother's] non-compliance with her medication.

34. On March 12, 2020, the respondent mother worked her shift . . . . During the shift the paternal grandmother drove the respondent father to the [respondent mother's work] to get the pick-up truck that the respondent mother had driven to work that day. She was left without any way to get home after her shift. The respondent mother called the respondent father multiple times to pick her up and bring her home, but he did not answer any of her calls or texts. According to her co-worker and her mother, the respondent mother was very upset and crying that day. The respondent mother called her mother . . . to come pick her up from [work].

35. Around 4:30 pm [Robert] saw the respondent father and [the paternal grandmother] at [the respondent mother's work] together in the pick-up truck without the juveniles.

36. [The maternal grandmother] took the respondent mother to her house and not to the respondent mother's home on March 12, 2020 between 5:30 pm and 6:00 pm.

37. After the respondent mother had left [work], the respondent father arrived and inquired if the respondent mother was still there.

38. After the respondent father left [the respondent mother's work] (sometime after 6:00 pm), [the paternal grandmother] arrived and came inside the store and left a few minutes later.

39.    After appearing at [the respondent mother's work], [the paternal grandmother] called the store several times and spoke to the manger [sic]. [Robert] heard [the paternal grandmother] call the respondent mother names and said the respondent mother had been at work since 6:00 a.m. and that she needed to come home and take care of her kids and if she doesn't come home someone will take care of her kids for her.

40.    The respondent father came to [the maternal grandmother's] home and spoke to the respondent mother and [the maternal grandmother] for approximately two hours. During the conversation, the respondent father's phone rang approximately eighteen (18) times with the paternal grandmother calling him, between 7:01 and 7:52 pm. He did not answer and tossed his phone at one point because he was tired of the repeated calls. At 7:52 pm the respondent father answered the call from his mother and then hurried the respondent mother home without telling her the nature of the phone call. The paternal grandmother did not call the respondent father again until 8:42 pm, right as the respondent parents arrived at Moses Cone hospital with [Wade].

. . . .

42.    When the respondent parents returned home, [the paternal grandmother] was holding [Wade] (the youngest juvenile) in her arms, wrapped in a blanket and she told the respondent parents that [Wade] had been burned. The respondent mother took [Wade], walked him up the stairs, laid him down and unwrapped the blanket to inspect his injuries (which were bleeding, blistered, and oozing at that time) before she wrapped him back up and took him downstairs and out to the car. The respondent parents then took [Wade] to Moses Cone hospital.

43.    They arrived at Moses Cone hospital at 8:41 pm. Both respondent parents told hospital employees that [Wade] was in his swing when the family dog

knocked over the swing causing [Wade] to fall out of the swing and onto a space heater. That this happened just prior to arrival and they came immediately to Moses Cone. This series of events was a complete lie that was told by both parents and the paternal grandmother over and over to hospital employees, social workers, and law enforcement. The respondent parents did not just panic and tell a story about [Wade's] injuries on March 12, 2020; they conspired together with [the paternal grandmother] to develop a completely false narrative.

44. At no time between [the paternal grandmother] discovering [Wade's] injury and arrival at 8:41 pm did anyone call 911. [The paternal grandmother] did not call 911 while she was at home alone with the juveniles; instead she called the respondent father 18 times before he answered his phone. The respondent parents did not call 911 after learning of the injuries, when they saw [Wade] at the home or on the way to the hospital.

45. The lack of supervision of these juveniles led to [Wade] sustaining his injuries.

46. [Wade] was transported via ambulance to Wake Forest Baptist Medical Center (WFBMC)/Brenner's Children's Hospital at 11:15 pm. By 2:30 a.m. abuse protocol was initiated, and security was placed bedside for [Wade]. There was a note that a social worker consult was required because of "vague explanations by parents" of the mechanism of [Wade's] injuries.

47. The WFBMC records have different stories about how [Wade] sustained his injuries: He was in a rocker, glider, tripod swing, or wooden bassinet; he was knocked out of the swing and onto the heater; he rolled out of the rocker and rolled into the heater. At some point, a physician notes that [Wade's] burns were consistent with burns from a heater, but it was not likely that there was a dog involved.

48. [Wade] sustained first, second, and third degree burns to 8.3 percent of his body area, concentrated on the left thigh, calf, and foot. He had second degree burns around his left hip area and a slight first degree burns to the left abdomen and under his left arm. He required surgery to remove the dead skin. [Wade] remained at WFBMC until April 2, 2020.

49. Guilford County social worker (SW) Cquadayshia Sharpe received an investigative assessment for physical abuse and/or injurious environment that required immediate response on March 13, 2020.

50. SW Sharpe went to [the respondents' home] and met with [the paternal grandmother] on March 13, 2020. [The paternal grandmother] would not allow SW Sharpe inside the home or to have access to the two juveniles that were present [Wren and Wes]. When SW Sharpe indicated that she would have to get law enforcement involved if she could not see the two juveniles, [the paternal grandmother] brought the juveniles outside. SW Sharpe tried to talk to [Wes], but [the paternal grandmother would answer the questions for the juvenile.

. . . .

52. The respondent father indicated to hospital employees and the Guilford County Department of Social Services (GCDSS) that he hired an attorney within days of March 12, 2020.

53. SW Sharpe was never allowed into the home voluntarily by the respondent parents or [the paternal grandmother]. She set up one walk through for March 16, 2020, however, the respondent father called and canceled that on advice of counsel.

. . . .

64. There are many inconsistencies in the respondent parents' stories about this incident, as delineated in the findings of fact and also including, but not limited to, the heater being run for days even though

it was warm outside, [Wade] only wearing a diaper and shirt even though it was cold enough to run the heater, and the children were being kept in that room to keep them warm.

. . . .

93. Although respondent mother had concerns with [Wren's] behaviors at her 12-month well child checkup, respondent mother did not attend a parent educator appointment nor did [Wren] attend her 15-month well child appointment. The respondent parents brought up [Wren's] challenging behaviors (and specifically repeated attempts to hurt other people) at [Wade's] one-month well baby check on January 17, 2020 but cancelled her 18-month appointment three times in the month of February and rescheduled when she was 20 months old (March 30, 2020). The respondent parents had allowed [Wren's] Medicaid coverage to lapse. The respondent parents have not attended to [Wren's] medical needs as necessary.

94. If the respondent parents had such a concern about [Wren's] behavior's towards others, leaving she and [Wade] in a bedroom unattended would not have been appropriate.

95. "Although it is possible, I find it highly unlikely that [Wren] climbed out of her crib, displaced [Wade] from his cradle, and then climbed back into her crib." This statement from Dr. Esther Smith, MD was noted on page 16 of [Wren's] CME.

. . . .

99. [Wade] did not roll over by himself until he was placed in kinship placement with the [maternal grandparents], which would have been sometime after April 2, 2020. He could not roll over by himself on March 12, 2020.

100. Dr. Esther Smith, MD indicated that [Wade's] sleeping environment was unsafe in that it was in close proximity to a heat source, there were excessive blankets creating a suffocation risk, and a

fall risk due to an improperly assembled rocking cradle.

101.  Dr. Esther Smith, MD spoke to Dr. Meggan Goodpasture, who reported meeting with [the maternal grandmother] and then with the respondent father. Dr. Goodpasture "felt the initial meeting was not even that inflammatory, dad just seemed controlling." Dr. Goodpasture was aware of an allegation of domestic violence between the parents, but the hospital "staff could never get mom alone." After Dr. Goodpasture advised [the maternal grandmother] to explain any safety concerns to CPS, she received a call from the hospital compliance department, advising that respondent father does not want her going back into [Wade's] room any further. This was documented on page 4 of [Wade's] CME.

102.  That in regard to [Wade], the respondent parents and/or caretaker have inflicted or allowed to be inflicted serious physical injury, possible by other than accidental means and/or created a serious risk of physical injury by other than accidental means.

103.  That the juveniles' parents and/or caretaker did not provide appropriate care or supervision for the juveniles and created an injurious environment placing the juveniles at substantial risk of harm.

¶ 32        Respondent-Mother contends finding of fact 102 is a conclusion of law. We

agree. Accordingly, we will review finding of fact 102 as a conclusion of law below.

*See Stan D. Bowles Distributing Co. v. Pabst Brewing Co.*, 69 N.C. App. 341, 344, 317

S.E.2d 684, 686 (1984) ("If [a] finding of fact is essentially a conclusion of law . . . it

will be treated as a conclusion of law which is reviewable on appeal."). Respondents

do not challenge any other findings of fact; therefore, the remaining findings of fact

are deemed supported by competent evidence and are binding on appeal. *See In re J.M.W.*, 179 N.C. at 792, 635 S.E.2d at 919.

¶ 33        Respondent-Mother relies on *In re K.L.* in arguing the trial court's abuse adjudication must be reversed because there is no clear and convincing evidence that Wade's injury was non-accidental. 272 N.C. App. 30, 845 S.E.2d 182. In *In re K.L.*, our Court reversed the trial court's order adjudicating a juvenile abused on the basis that there was "nothing to bridge the evidentiary gap between the unexplained injuries . . . and the conclusion that Respondents inflicted them . . . ." *Id.* at 46, 845 S.E.2d at 194. Multiple physicians testified at the adjudication hearing. *Id.* at 34–35, 845 S.E.2d at 187. Although one treating doctor who testified had ordered the child's entire body to be assessed for other injuries, he made no abnormal findings. *Id.* at 34, 845 S.E.2d at 187. Despite the lack of abnormal findings, the doctor opined that some type of physical abuse was "highly probable" because the parents could not provide a history to explain the six fractures in the child's legs. *Id.* at 34, 845 S.E.2d at 187. The Court reasoned that reversal of the abuse adjudication was proper on the ground there were no red flags in the record such as substance abuse, domestic violence, or inappropriate discipline or other evidence by which the trial court could infer the child was abused; thus, the fact that respondents could not explain the baby's fractures was insufficient to support the trial court's conclusion of abuse. *Id.* at 46, 845 S.E.2d at 194. Furthermore, the respondent mother did not delay in

seeking medical treatment and was "forthcoming and cooperative" in DDS's investigation. *Id.* at 46, 845 S.E.2d at 194. Finally, there was no clear or convincing evidence to support the finding the child's injury had occurred while the child was in the exclusive care of the parents on a certain date. *Id.* at 37–38, 845 S.E.2d at 189–190.

¶ 34 We reject Respondent-Mother's contention that *In re K.L.* demands reversal of the trial court's adjudications in this case. We note it is undisputed that Wade's injury occurred on 12 March 2020 while he was in the exclusive care of the children's caretaker, the paternal grandmother. Here, unlike *In re K.L.*, there are ample, unchallenged findings of fact to support the inference the child's injury occurred by non-accidental means. *See id.* at 40, 845 S.E.2d at 191.

¶ 35 First, doctors and social workers pointed to multiple red flags of potential domestic abuse, which were documented in the trial court's findings of fact, including findings of fact 32, 33, 43, 46, 47, 64, 95, 99, and 100. These findings of fact establish the paternal grandmother had made several threats to or regarding Respondent-Mother or the children including on the day of Wade's injury; Respondents and the paternal grandmother conspired to create "false narratives"; Respondents and the paternal grandmother repeated multiple, inconsistent stories regarding the events surrounding Wade's injuries, who was caring for Wade on 12 March 2020, and when treatment was sought; Respondents provided vague, improbable explanations

regarding the mechanism of the injury; Respondents' final story of events blaming their toddler daughter was "highly unlikely"; and doctors treating Wade had reasons to suspect abuse in Respondents' home, including BCH receiving an anonymous call in which the caller alleged domestic abuse in Respondents' home. These unchallenged findings of fact are deemed supported by clear and convincing evidence. *See In re J.M.W.*, 179 N.C. at 792, 635 S.E.2d at 919.

¶ 36        Second, the findings of fact show there was a delay of approximately one hour and forty minutes from the time the paternal grandmother initially called Respondent-Father at 7:01 p.m. to report the injury to 8:41 p.m. when Wade was taken to the hospital for treatment; at no point did the paternal grandmother or either Respondent seek emergency medical services from 911 for Wade's severe burns.

¶ 37        Finally, findings of fact 50, 53, 63, 70, 73, 77, and 80 show Respondents were not "forthcoming" or "cooperative" with the agencies handling investigations into Wade's injuries, including GCDSS, ACDSS, and the Guilford County Sheriff's Office; rather, Respondents told a "complete lie" and multiple "false narratives" to explain Wade's injury and would not assist ACDSS with completing a review of Respondents' home to ensure concerns were addressed. *In re K.L.*, 272 N.C. App. at 46, 845 S.E.2d at 194. For the previously stated reasons, "the trial court's findings of fact . . . support the inference" Respondents and the paternal grandmother are responsible for Wade's

injury, and the injury was non-accidental. *See In re K.L.*, 272 N.C. App. at 40, 845 S.E.2d at 191.

## 2. *Conclusions of Law regarding Abuse*

¶ 38   As an initial matter, we consider finding of fact 102 as a conclusion of law to determine whether it is supported by the findings of fact. *See In re F.C.D.*, 244 N.C. App. at 246 780 S.E.2d at 217.  Respondent-Mother focuses on the trial court's lack of the essential element of "non-accidental means" to argue Respondents and the paternal grandmother did not *inflict* serious physical injury on Wade, in violation of N.C. Gen. Stat. § 7B-101(1)(a) (2019).  She fails to address the trial court's conclusions that Respondents posed a "*substantial risk of harm*" to the children and there was a "serious risk of physical injury by other than accidental means" in the home. However, as analyzed in detail above, there are sufficient findings of fact to support the legal conclusions that the injury was non-accidental, and Wade is an abused juvenile as defined by N.C. Gen. Stat. § 7B-101(1)(b). *See In re F.C.D.*, 244 N.C. App. at 246 780 S.E.2d at 217; N.C. Gen. Stat. § 7B-101(1)(b).

¶ 39   Both Respondents maintain that there was no witness testimony to support a finding that the injuries were non-accidental.  We find Respondents' arguments that witness testimony is required to support a finding that an injury is "non-accidental" are without merit.  Respondents point to no cases to support their contentions that medical testimony or other witness testimony is *required* to prove under N.C. Gen.

Stat. § 7B-101(1) an injury is "by other than accidental means." We note in the instant case, there is no witness testimony, or any other direct evidence for that matter, that the juvenile was burned through "non-accidental" means. Again, the trial court's conclusion is supported by sufficient, binding findings, which in turn support the inference the injuries were non-accidental.

¶ 40    Next, Respondents both argue that the lack of supervision of a juvenile falls under the statutory definition of neglect, not abuse. *In re K.B.*, our Court considered this argument when a trial court found a juvenile's parents failed to properly provide the juvenile with his prescribed medications used to treat his mental health and behavioral issues and adjudicated the minor abused, neglected, and dependent. 253 N.C. App. 423, 428, 801 S.E.2d 160, 164 (2017). The trial court also found the parents did not properly supervise the special-needs juvenile to ensure he would not hurt himself. *Id.* at 435, 801 S.E.2d at 167–68. We upheld the trial court's adjudications and held the respondents created a substantial risk of physical injury by other than accidental means by failing to provide the juvenile's medication and by failing to provide adequate supervision of their child; therefore, the trial court's findings supported the conclusion that the juvenile was abused. *Id.* at 435, 801 S.E.2d at 168.

¶ 41    Similar to *In re K.B.*, in the case *sub judice*, the trial court made multiple findings, including findings of fact 31, 35, 38, and 45, to support the conclusion Respondents created a substantial risk of physical injury for their young juvenile

children by allowing them to be left unsupervised. *See id.*, 253 N.C. App. at 434–35, 801 S.E.2d at 167–68. The findings show Respondent-Mother knew of the paternal grandmother's unstable behavior, which necessitated medication, and the substantial risk of physical injury her volatile conduct posed to the children. *See In re M.G.*,187 N.C. App. at 549, 653 S.E.2d at 589; *In re L.C.*, 253 N.C. App. 67, 72, 800 S.E.2d 82, 87 (2017) (stating a respondent mother's *knowledge* of her child's previous abuse in her home would support a conclusion that the parent allowed a substantial risk of serious injury to the child to be created by allowing the perpetrator to remain in the home). Despite this risk, Respondent-Mother allowed the paternal grandmother to continue to care for her children, and she failed to take steps to ensure her children were properly supervised and protected. *See In re M.G.*,187 N.C. App. at 549, 653 S.E.2d at 589. The unchallenged findings of fact 32, 33, and 39 establish the paternal grandmother pointed a gun and threatened Respondent-Mother while in the close presence of Wes when he was an infant due to the paternal grandmother failing to take her medication; the paternal grandmother was verbally abusive to Respondent-Mother when she did not take her medication; and, on the day of the injury, the paternal grandmother left the small children alone in the home and later called Respondent-Mother's manager at work to call Respondent-Mother names, and to threaten "someone w[ould] take care of [Respondent-Mother's] kids for her" if she did not. Therefore, we hold the trial court's adjudication of abuse is supported by findings

of fact, which are in turn deemed supported by clear and convincing evidence. *See In re F.C.D.*, 244 N.C. App. at 246 780 S.E.2d at 217.

## B. Adjudication of Dependency

¶ 42 Respondent-Mother argues that there was no evidence in the record or findings of fact made by the trial court to demonstrate her inability to care for the children. Similarly, Respondent-Father contends the trial court did not find he or Respondent-Mother was unable to care for their children. We disagree.

¶ 43 The Juvenile Code defines a "dependent juvenile" as a

> [j]uvenile in need of assistance or placement because (i) the juvenile has no parent, guardian, or custodian responsible for the juvenile's care or supervision or (ii) the juvenile's parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement.

N.C. Gen. Stat. § 7B-101(9) (2019). The trial court is required to make findings of facts that address both prongs of N.C. Gen. Stat. § 7B-101(9): (1) the parent's inability to provide care or supervision; and (2) the unavailability to the parent of alternative child care arrangements before a juvenile may be adjudicated as dependent. *In re P.M.*, 169 N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005). A juvenile may not be adjudicated dependent so long as at least one parent is capable of providing or arranging for adequate care and supervision of the child. *In re V.B.*, 239 N.C. App. 340, 342, 768 S.E.2d 867, 868 (2015).

¶ 44 "[T]he purpose of an adjudicatory hearing [for a dependency proceeding] is to determine only 'the existence or nonexistence of any of the conditions alleged in a petition.'" *In re V.B.*, 239 N.C. App. at 344, 768 S.E.2d at 869–70 (quoting N.C. Gen. Stat. § 7B-802).

¶ 45 Here, the trial court made the following uncontested findings of fact pertinent to the children's dependency adjudication:

> 45. The lack of supervision of these juveniles led to [Wade] sustaining his injuries.
>
> . . . .
>
> 80. ACDSS was not allowed to enter into the respondent parent's home before the petition was filed even though the juveniles were not placed at that residence. ACDSS attempted at least six (6) home visits with the respondent parents before the petition was filed. ACDSS was unable to follow up with an in-home review (before the petition was filed) to see if any concerns had been corrected.
>
> . . . .
>
> 82. On July 21, 2020 [the maternal grandmother] told ACDSS social workers that she was overwhelmed with all three juveniles, that she had "backhanded" [Wren] because [Wren] split in [her] face, and that she was frustrated with the respondent parents being late to their visits. ACDSS immediately removed the juveniles from the [maternal grandparents] home and began finding another placement.
>
> . . . .
>
> 86. Between July 21, 2020 and August 21, 2020, ACDSS inquired of the respondent parents for an alternative plan of care for the juveniles. The respondent parents were able to give two names to SWS Baldwin for the vetting process. ACDSS received

lots of calls and emails from random individuals inquiring about caring for the juveniles during this time period. ACDSS would not discuss the care of the juveniles on these calls and emails due to confidentiality. ACDSS followed up with the respondent parents by asking them repeatedly to not have random people call ACDSS, but rather just submit their proposed caregivers to SW Chaney and SWS Baldwin.

87. Of the two names that were given to ACDSS by the respondent parents, one person was determined to work at ACDSS (but not in the CPS unit) and was thus ineligible. The second person called ACDSS and left a voicemail stating that he was a neighbor of the respondent parents and was approached randomly by the respondent father and asked to care for the juveniles. He indicated that he was not able to care for the juveniles.

88. This failure to make an appropriate plan of care for the juveniles led to the filing of the petitions on August 21, 2020.

89. [Wes] did not see a primary care pediatrician . . . from 7 months until he was 32 months old. He also went from age 32 months until age 5 years old without seeing a primary care pediatrician. In his medical records, there were notes about developmental delays (including severe delayed speech) and a concern about possible autism and services were recommended to the parents, but they were discontinued due to multiple missed appointments. [Wes] failed a hearing test at age 5, but passed a hearing test at age 6. The respondent parents have not attended to [Wes's] developmental and medical needs as necessary.

. . . .

91. Although [Wes] had developmental delays, the respondent parents did not enroll him in public kindergarten. They also did not have an established home school structure in place for [Wes]. The

respondent parents have not attended to [Wes's] educational needs as necessary.

. . . .

93. Although respondent mother had concerns with [Wren's] behaviors at her 12-month well child checkup, respondent mother did not attend a parent educator appointment nor did [Wren] attend her 15-month well child appointment. The respondent parents brought up [Wren's] challenging behaviors (and specifically repeated attempts to hurt other people) at [Wade's] one-month well baby check on January 17, 2020 but cancelled her 18-month appointment three times in the month of February and rescheduled when she was 20 months old (March 30, 2020). The respondent parents had allowed [Wren's] Medicaid coverage to lapse. The respondent parents have not attended to [Wren's medical needs as necessary.

. . . .

100. Dr. Esther Smith, MD indicated that [Wade's] sleeping environment was unsafe in that it was in close proximity to a heat source, there were excessive blankets creating a suffocation risk, and a fall risk due to an improperly assembled rocking cradle.

. . . .

103. That the juveniles' parents and/or caretaker did not provide appropriate care or supervision for the juveniles and created an injurious environment placing the juveniles at substantial risk of harm.

104. The juveniles' parents and/or caretaker did not have an appropriate, alternative plan of care.

¶ 46    In this case, ACDSS filed its petitions on 21 August 2021 alleging all three

children were dependent. Prior to the petitions being filed, ACDSS gave Respondents

the opportunity to provide an alternative kinship placement because the placement

with the neighbors of the maternal grandparents was scheduled to end on 21 August 2021. When Respondents could not provide another placement, ACDSS sought non-secure custody. ACDSS also gave Respondents the opportunity to address the agency's concerns with their home; however, Respondents failed to allow ACDSS to perform an in-home review to assess the changes and refused ACDSS into their home on more than six occasions. Based on the findings of fact, the trial court concluded as a matter of law that Wade, Wren, and Wes were dependent juveniles under N.C. Gen. Stat. § 7B-101(9).

¶ 47        The above findings of fact related to the juveniles' dependency were not challenged by Respondents; thus, the findings are binding on appeal. *See In re J.M.W.*, 179 N.C. at 792, 635 S.E.2d at 919. The findings of fact establish: (1) Respondents' lack of care and supervision over the children led to Wade's injury; (2) Respondents were unable to provide ACDSS with an alternative plan of care for the children after the temporary placement with the maternal grandparents' neighbors ended; (3) Respondents failed to meet Wes' educational needs; and (4) Respondents failed to meet the children's medical needs. We hold the findings of fact are sufficient to support a conclusion that Respondents were "unable to provide for the juvenile[s'] care or supervision and lack[ed] an appropriate alternative child care arrangement." *See* N.C. Gen. Stat. § 7B-101(9).

**V. Disposition**

## A. Steps toward Reunification

The North Carolina General Statutes grants a trial judge the authority to order a parent at a dispositional hearing to "[t]ake appropriate steps to remedy conditions in the home that led to or contributed to the juvenile's adjudication or to the court's decision to remove custody of the juvenile from the parent . . . ." N.C. Gen. Stat. § 7B-904(d1)(3) (2019). "For a court to properly exercise the authority permitted by [Section 7B-904(d1)], there must be a nexus between the step ordered by the court and a condition that is found or alleged to have led to or contributed to the adjudication." *In re T.N.G.*, 244 N.C. App. 398, 408, 781 S.E.2d 93, 101 (2015) (citation omitted).

In this case, the trial court ordered Respondent-Mother to take part in certain activities which it found were reasonably related to the reasons for the juveniles' removal and were aimed at achieving the plan of reunification. Respondent-Mother challenges portions of the following steps imposed by the trial court:

1. The mother is to provide proof of a sufficient source of income to support herself and her children and use funds to meet basic needs. She can work to achieve this goal by providing income receipts and a budget to the [social worker].
2. That the mother will refrain from allowing mental health to impact parenting and provide a safe, appropriate home by not exposing her children to injurious environment. In order to achieve this goal, the mother will obtain and follow the recommendations of a mental health assessment and psychological

evaluation. The mother will also participate in domestic violence assessment and participate in all recommended services.

¶ 50 Respondent-Mother first argues that her "only 'fault' [is] she was working many hours to provide financially for her family and left her children in the care of their grandmother;" thus, the requirement to show proof of income is unnecessary. We disagree.

¶ 51 Here, the trial court found a condition that led to the children's adjudication was lack of care and supervision. In response, the court ordered Respondent-Mother to show proof of income. This requirement is reasonably related to ensuring the children have adequate care and supervision and to addressing the risk factors identified by ACDSS, including to ensure a safe home environment. *See In re A.R.*, 227 N.C. App. 518, 522, 742 S.E.2d 629, 623–33 (2013) (holding proof of income was reasonably related to remedying the condition of domestic violence, which led to children's removal from their parents' home).

¶ 52 Next, Respondent-Mother argues there is no evidence in the record that she suffered from mental illness; therefore, the provision that Respondent-Mother "refrain from allowing mental health to impact [her] parenting" bears no relationship to her children's removal from her home. We disagree. Again, the trial court's findings that Respondent-Mother had conspired with Respondent-Father and the paternal grandmother "to develop a completely false narrative" about Wade's injuries

and that Respondent-Mother "promulgated [a] false narrative" about her toddler child being at fault for Wade's burns support the trial court's mandate. Additionally, physicians and social workers had reason to suspect domestic violence occurred in Respondents' home but "could never get mom alone" and the social workers were never able to complete their in-home review before the adjudication petitions were filed. The trial court's decree is reasonably related to ensuring the children's safety and proper supervision.

¶ 53      We hold the trial court's order that Respondent-Mother show proof of income and "refrain from allowing mental health to impact parenting" are "appropriate steps to remedy conditions in the home that led to or contributed to the juvenile's adjudication." *See* N.C. Gen. Stat. § 7B-904(d1)(3).

## B. Visitation

¶ 54      Respondent-Mother contends the trial court abused its discretion by limiting Respondent-Mother's visitation with her children to one-hour of highly supervised weekly visits because "[t]here is absolutely zero evidence in the record that [Respondent-Mother] presented any kind of threat to harm her children." We disagree.

¶ 55      "This Court reviews the trial court's dispositional orders of visitation for an abuse of discretion." *In re C.M.*, 183 N.C. App. 207, 215, 644 S.E.2d 588, 595 (2007) (citation omitted).

N.C. Gen. Stat. § 7B-905.1 provides:

> [a]n order that removes custody of a juvenile from a parent
> . . . or that continues the juvenile's placement outside the
> home shall provide for visitation that is in the best
> interests of the juvenile consistent with the juvenile's
> health and safety, including no visitation.

N.C. Gen. Stat. § 7B-905.1(a) (2019).

Here, the trial court addressed Respondent-Mother's visitation with her children in its dispositional order and granted the following plan:

> [Respondent-Mother] shall have visitation on Fridays from
> 11 a.m. until 12 p.m. which is consistent with the juveniles'
> health and safety. That the level of supervision shall
> include high—eyes and ears on, direct supervision. The
> parties may mutually agree to additional visitation with
> the same level of supervision or to change the location of
> visitation.

Respondent-Mother relies on the trial court's finding that the visits with her children while they were placed with the neighbor of the maternal grandmother were "normal" and "loving" to argue her visitation should not have changed from four hours per day to once per week after the children were placed in a foster home. However, Respondents were aware that the neighbors could act only as a temporary placement until 21 July 2020. Respondents failed to provide ACDSS with the name of an appropriate alternative placement before the placement with the neighbors ended. Accordingly, ACDSS filed petitions and sought nonsecure custody of the children. ACDSS placed the children with a foster family in Moore County, an approximate

one-and-a-half-hour drive from Respondents' home, so that all three children could be placed together. Respondent-Mother fails to cite to any case in which this Court held that a limitation on visitation to once per week was an abuse of discretion after a juvenile had been placed in foster care. The highly supervised, one-hour weekly visits with Respondents is consistent with the 4 November 2020 recommendation of the guardian *ad litem* as well as ACDSS's recommendations in its 18 November 2020 dispositional court report. Additionally, the trial court's order allows the option for the foster family and Respondents to agree to additional visitation time. Therefore, the trial court had a reasonable basis for limiting Respondent-Mother's visitation with the children to one-hour, weekly visits.

### C. Constitutional Right to Parent

¶ 59     "The standard of review for alleged violations of constitutional rights is *de novo.*" *In re L.C.*, 253 N.C. App. 67, 72, 800 S.E.2d 82, 87 (2017) (citation omitted). "[A] trial court's determination that a parent's conduct is inconsistent with his or her constitutionally protected status must be supported by clear and convincing evidence." *Adams v. Tessener*, 354 N.C. 57, 63, 550 S.E.2d 499, 503 (2001) (citation omitted).

¶ 60     "This Court has held that where a parent is on notice that guardianship with a third party has been recommended and will be determined at the hearing, if the parent fails to raise this argument at the hearing, appellate review of the

constitutional issues is waived." *In re S.R.J.T.*, 2021-NCCOA-94 ¶ 17. In order for waiver to occur, the parent must have been afforded the opportunity to object or raise the argument at the hearing. *In re R.P.*, 252 N.C. App. 301, 305, 798 S.E.2d 428, 431 (2017); *see In re C.P.*, 258 N.C. App. 241, 246, 812 S.E.2d 188, 192 (2018) (holding waiver occurred where a respondent did not "argue[ ] to the court or otherwise raise[ ] the issue that guardianship would be an inappropriate disposition *on a constitutional basis*.") (emphasis added).

¶ 61     In this case, Respondent-Mother's counsel was on notice that guardianship of the children was recommended, and she had an opportunity to be heard at the dispositional hearing on the issue. In response, counsel stated at the hearing that Respondent-Mother would "of course . . . like to have custody of the children, and it's her position that she could handle that. We would like to ask for expanded visitation, and that has been offered." Counsel for Respondent-Mother also argued to the trial court at the dispositional hearing that the allegations against Respondents related to abuse, neglect, and dependency be dismissed and the children be returned to Respondents' home. At no point during the hearing did Respondent-Mother or Respondent-Mother's counsel raise the issue of Respondent-Mother's constitutional rights afforded to her as a parent. Therefore, we hold Respondent-Mother waived her right to raise the constitutional argument on appeal. *See In re T.P.*, 217 N.C. App. 181, 186, 718 S.E.2d 716, 719 (2011) (holding the respondent mother waived review

of the issue of whether she acted in a manner inconsistent with her constitutionally protect status as a parent because she failed to object at trial).

## VI. Conclusion

We affirm the trial court's adjudication of Wade as an abused, neglected, and dependent juvenile and its adjudication of Wes and Wren as neglected and dependent juveniles. We hold the trial court did not err in mandating Respondent-Mother to show proof of income and "to refrain from allowing mental health to impact parenting" as appropriate steps to remedy the conditions in the Respondents' home that led to the juveniles' adjudications. We affirm the trial court's visitation plan in the disposition order. Finally, we hold Respondent-Mother waived her constitutional argument as to the trial court's conclusion that she acted in a manner inconsistent with her status as a parent.

AFFIRMED.

Judges DILLON and INMAN concur.